(No. 66001.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. STEVEN SMITH, Appellant.

*Opinion filed November 21, 1990.—Rehearing denied February 4, 1991.*

44

MILLER, J., dissenting.

Randolph N. Stone, Public Defender, of Chicago (Ronald P. Alwin, Assistant Public Defender, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Cecil A. Partee and Jack O'Malley, State's Attorneys, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee G. Goldfarb, Assistant State's Attorney, and Jean T. McGuire, Special Assistant State's Attorney, of counsel), for the People.

JUSTICE RYAN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Steven Smith, was convicted of the murder of Virdeen Willis, Jr. The State, seeking the death penalty, moved for a separate sentencing hearing. Defendant waived his right to a jury for the sentencing phase of the proceedings. The trial court found the existence of a statutory aggravating factor (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)) and determined that defendant was eligible for the death penalty. At the end of the bifurcated sentencing hearing, the trial court found that there were no mitigating factors sufficient to preclude imposition of the death penalty. Accordingly, the court sentenced defendant to death. The sentence was stayed (107 Ill. 2d R. 609(a)), pending direct appeal to this court

(107 Ill. 2d R. 603). We reverse defendant's conviction of murder and remand this cause to the circuit court of Cook County for a new trial.

Before this court, defendant raises numerous issues concerning both the trial and sentencing proceedings below. Defendant initially argues that it was reversible error for the trial court to admit evidence of the victim's attitude toward and treatment of gang-related activity and of the victim's altercation with a gang leader. Defendant next asserts that he was unfairly prejudiced by certain remarks of the prosecutor during opening statement and closing argument. Defendant further asserts that it was reversible error for the prosecutor to suggest, in closing argument, that several of the State's witnesses had been threatened and forced to leave Chicago. Defendant argues that the cumulative effect of the evidence of gang-related activity and of the prosecutor's argument to the jury deprived defendant of due process. Defendant further posits that a prison incident report admitted into evidence was improperly admitted under the business records exception to the rule against hearsay. Defendant raises numerous other issues arising from both his trial and sentencing hearing, but our disposition of this case obviates the need to address those issues.

At the time of the murder, the victim, Virdeen Willis, Jr., was an assistant warden at Pontiac Correctional Center in Pontiac, Illinois. On the evening of June 30, 1985, Willis and his friend, Robbin Howland, drove to Chicago. They went into the Shamrock Lounge, a bar owned by Willis' cousin Maggie. Willis parked his car in a vacant lot next to the lounge.

Hasan Ali was tending bar at the Shamrock Lounge that evening. Willis and Howland were sitting at the bar. Ali testified that he noticed three men enter the bar and sit at a table behind Willis and Howland. He later identified the men as defendant, Herbert Stevens and Robert

Spade. Defendant was wearing a black leather jacket, black pants, black shoes and a black cap with a short beak that evening. Ali testified that Stevens and Spade were also wearing dark clothing. Ali testified that as they sat at the table, defendant, Stevens and Spade were all facing Willis "like they was looking directly at him." Ali further stated that he picked up a .38-caliber revolver, which he kept behind the bar, and put it in his pocket because he thought they were there to rob the place.

Meanwhile, Rhonda Carraway was walking near the Shamrock Lounge on her way to a friend's house. As she was walking, she met Treadis Murray, whom she knew from the neighborhood. She stated that Murray was a friend or "associate" of hers. She testified that Murray was known as "King Treadis" or "Chief Treadis," and was the leader of the King Cobra street gang. Rhonda Carraway testified that she had once been in an apartment in the neighborhood where Murray, defendant, and Stevens were present. A statue of a black cobra was on the mantlepiece. Carraway stated that she had a conversation with Murray, and then entered the Shamrock Lounge and told Stevens that Murray wanted Stevens to come outside. Stevens and Carraway then left the lounge. Carraway walked upstairs to her girlfriend's home, while Stevens walked toward Murray. Carraway testified that when she got upstairs, she walked out onto her girlfriend's balcony, looked down, and saw that Stevens and Murray were gone.

Hasan Ali testified that he observed a woman enter the bar and summon one of the men seated at the table with defendant. The man and the woman then left the bar. The man later returned, accompanied by some other men. Some time later, the men, including defendant, left the lounge while Willis and Howland were still seated at the bar. Shortly after 9 p.m., Willis and Howland got up

to leave the lounge. They paused for a time while Willis spoke to his cousin, and then Willis, Howland and cousin Maggie left the lounge.

Outside the lounge, Willis and Maggie walked ahead of Howland toward Willis' car. Willis walked to the driver's side of the car, which was facing the street. Howland paused at the corner of the lounge while Willis and Maggie talked. Howland said that she looked back toward the lounge and saw the silhouette of a man with a gun about five feet from Willis. His arm was pointed straight out past her in the direction of Willis and Maggie. Howland stated that she then heard a pop or a crack, and saw smoke come up in front of her face. The gunman then moved toward Willis, who was lying on the ground. The gunman was in a crouched position with the gun extended in his hand. Howland testified that he was waving the gun back and forth. She stated that she then ran back to the Shamrock Lounge and told Hasan Ali to call the police. She testified that the gunman was dressed in black and was wearing a hat, but that she did not see his face.

Debra Carraway, Rhonda Carraway's sister, testified that she and a man named Pervis Bell parked across the street from the Shamrock Lounge between 9 and 9:30 p.m. on June 30, 1985. Bell went into the Shamrock Lounge while Debra Carraway remained in the car. Subsequently, Debra Carraway got out of the car, stepping into a puddle of water. She testified that while she stood shaking the water from her feet, she saw two women and a man walk out of the Shamrock Lounge. She stated that they walked toward a car parked in the vacant lot next to the lounge. The man walked to the driver's door of the car. She said that she then saw another man walk up behind them, approximately three seconds after them. She testified that the other man was defendant, whom she knew from the neighborhood and who had

dated her sister a few years earlier. She stated that defendant had a gun in his hand. She said that defendant walked up to the man standing by the car and shot him. She heard the shot and saw smoke. She indicated that defendant then turned and looked both ways while moving his hand back and forth. She stated that at one point after the shooting, defendant was facing in her direction, toward the street. She testified that she saw defendant for approximately two seconds before the shot was fired, and for a second or two thereafter. Defendant then ran through the vacant lot toward an alley.

Debra Carraway testified that she then saw one of the women who was with the victim run back to the Shamrock Lounge. Carraway stated that she then ran to a bar near the Shamrock Lounge to try to find her sister. She stated that she did not find her sister, so she ran back to Bell's car and begged Bell to drive her to her mother's house. Bell complied. Debra Carraway did not speak to the police that night. Three days later, she went to the police station and related to the police what she had observed on June 30 concerning the shooting. At that time, she identified defendant in a photograph array.

Paramedics from the Chicago fire department arrived at the scene of the shooting shortly before 10 p.m. A paramedic testified that Willis was lying motionless in the vacant lot, with an apparent gunshot wound to the neck. He had no pulse and was not breathing. The paramedic stated that a crowd of perhaps 70 people had gathered in the lot. The paramedics took Willis to a hospital, where he was pronounced dead. An autopsy revealed that Willis died of a gunshot wound that entered the upper left area of his neck and lodged in his spine.

Rhonda Carraway testified that at the time of the shooting she had fallen asleep in her girlfriend's home, overlooking the vacant lot. Her girlfriend awakened

Rhonda Carraway. Rhonda looked out the window and saw an ambulance and some people gathered in the lot. She went downstairs to the lot. The ambulance and the people then left. She stated that after the ambulance had left, she noticed that defendant's van, which she had seen parked in the lot earlier, was gone. Chicago police interviewed Rhonda Carraway on July 1, 1985. She told the police that she had been at the Shamrock Lounge on June 30. She further identified photographs of defendant, Herbert Stevens, and Robert Spade.

Chicago police arrested defendant on July 4, 1985. At the time of the arrest, defendant was on a bicycle talking to Treadis Murray, who was sitting in a car parked in a lot in the neighborhood where the shooting occurred. On July 5, 1985, defendant signed a consent-to-search form for his apartment. A Chicago police detective searched defendant's apartment and recovered two black hats, two black jackets, a pair of black pants and black leather shoes. From these items, defendant identified the articles defendant was wearing on the night of the shooting.

At trial, William Johnson, an assistant warden at Pontiac Correctional Center, testified that he had known Virdeen Willis all of his life. Defense counsel objected to the prosecutor's attempt to elicit testimony from Johnson concerning the type of gang activity existing in the Illinois penitentiary system. At a sidebar conference on the objection, the prosecutor argued that the "entire motive in this case revolves around gang activity of individuals from Treadis Murray, and Steven Smith and the fact *** that Virdeen Willis was known in the penitentiary system as a strict disciplinarian ***." The prosecutor further argued that the evidence would show that a few years before the murder, Willis was working at the Stateville penitentiary, where Treadis Murray, at that time, was confined, and that Willis and Murray had had

an altercation in the penitentiary. The prosecutor revealed that the State's theory was that "Treadis Murray and the King Cobras caused the assassination" of Willis. He further posited that defendant was a member of the King Cobras. Defense counsel argued that the State's theory was "wild speculation," was highly prejudicial and was unsupported by evidence. The trial court ruled that the State could introduce three items of evidence: that Willis and Murray had had an altercation, that there was gang activity in prison, and that Willis was a strict disciplinarian.

Following the trial court's disposition of the objection, the prosecutor proceeded to elicit from Johnson testimony concerning gang activity in Stateville Correctional Center. Johnson testified that gang-related activity within the prison system includes extortion, recruiting, stabbings, fights, assaults on employees, and dope. He further testified that Virdeen Willis was "[v]ery firm and fair" with gangs in prison. Willis did not tolerate hand signals, colors, marching, or any other activity related to gangs. Johnson related that in July 1982, while Willis was employed at Stateville Correctional Center, Treadis Murray was an inmate there. On July 13, 1982, Willis subdued and handcuffed Murray, who was involved in a fight with another inmate. It was stipulated that at the time of Willis' death, defendant was 36 years old.

Defendant introduced no evidence at trial. Following arguments of counsel and deliberation of the jury, defendant was convicted of murder. Defendant's motion for a new trial was denied. Defendant waived his right to a jury for the sentencing phase of the proceedings. At the eligibility phase of the bifurcated death penalty hearing, the State introduced evidence that defendant had been convicted of two prior murders, in addition to the murder of Virdeen Willis. The trial court found defendant eligible for the death penalty. (Ill. Rev. Stat. 1985,

ch. 38, par. 9—1(b)(3).) At the close of the sentencing hearing, the trial court sentenced defendant to death.

Defendant initially asserts that it was reversible error for the trial court to admit evidence concerning gang-related activity in the Illinois penitentiary system, and indicating that Virdeen Willis, Jr., was a strict disciplinarian with respect to such activity. Defendant further asserts that it was error to admit evidence that Willis had had an altercation with Treadis Murray in prison. The State offered this evidence to support its theory that the murder of Willis was an assassination in retaliation for Willis' treatment of gang-related activity in the prisons where Willis was employed. Defendant argues that the prejudicial effect of this evidence substantially outweighed any probative value that it may have had. Defendant further asserts that the error in admission of this evidence was exacerbated by the prosecutor's opening statement and closing argument. The State responds that defendant has waived review of the admission of this evidence and of the propriety of the opening statement and closing argument by failing to raise the issues in his motion for a new trial, and by failing to object, at trial, to most of the prosecutor's statements now alleged to be reversibly erroneous. The State further argues that the evidence now complained of was admissible because it was probative of defendant's alleged motive for killing Virdeen Willis. Alternatively, the State asserts that admission of this evidence does not require reversal because the State's case against defendant did not rest on circumstantial evidence. An eyewitness identified defendant as the man who shot Virdeen Willis. We hold that defendant has not waived review of the admissibility of this evidence or of the accompanying argument based on that evidence. We further hold that error in the admission of the evidence and improper argument by the pros-

ecutor accompanying this evidence entitles defendant to a new trial.

We initially agree with the State that the failure to raise an issue in the written motion for a new trial ordinarily constitutes a waiver of the issue through procedural default, thus precluding defendant from urging the alleged error as a ground for reversal on review. (*People v. Young* (1989), 128 Ill. 2d 1, 38-39; *People v. Odle* (1988), 128 Ill. 2d 111, 133-34; *People v. Enoch* (1988), 122 Ill. 2d 176, 185-91.) There are exceptions to the waiver rule, however, where there has been plain error or defects affecting substantial rights which deprive the accused of a substantial means of enjoying a fair and impartial trial, or where the error occurs in cases in which the evidence is closely balanced. *People v. Odle* (1988), 128 Ill. 2d 111, 134; *People v. Gacho* (1988), 122 Ill. 2d 221, 239; 107 Ill. 2d R. 615(a).

Our review of the record reveals that the evidence adduced at trial was so closely balanced that application of the waiver rule is inappropriate in this case. The circumstantial evidence tending to link defendant to the killing of Willis merely narrowed the class of individuals who may have killed Willis. At least two other men were with defendant on the night of the shooting. Two of these men, like defendant, were also wearing dark clothing. Treadis Murray was also in the vicinity of the Shamrock Lounge that evening. Robbin Howland, who was standing only a few feet from the gunman at the time of the shooting, was unable to identify the gunman. The State's case rested chiefly on the eyewitness testimony of Debra Carraway. She provided the only direct evidence that defendant was the particular individual who shot Willis. Debra Carraway testified that she saw defendant but for a few seconds from across the street on the night of the shooting. It was not until three days later that she reported what she had seen to the police.

Her sister, Rhonda, was a friend or "associate" of Treadis Murray, a supposed leader of the King Cobra street gang. Rhonda testified that people in the neighborhood where the shooting occurred tended to do whatever Murray told them to do. Indeed, based on these factors, defense counsel, in closing argument, attacked the credibility of Debra Carraway, arguing that Debra Carraway had reason not only to avoid implicating Murray in the killing, but to affirmatively cast the direction of the investigation away from Murray. The jury was, of course, free to accept or reject her identification of defendant as the man who shot Willis. Credibility of a witness is within the province of the trier of fact, and the finding of the jury on such matters is entitled to great weight, but is not conclusive. We will reverse a conviction where the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of defendant's guilt. (*People v. Young* (1989), 128 Ill. 2d 1, 51; *People v. Pellegrino* (1964), 30 Ill. 2d 331, 334-35; *People v. Coulson* (1958), 13 Ill. 2d 290, 296.) We find that Debra Carraway's identification of defendant, standing alone, was not so unsatisfactory as to require reversal. For purposes of applying the waiver rule, however, we consider that the veracity of her testimony was tempered by the evidence discussed above. Since we perceive a strong likelihood that the weight which the jury attributed to her testimony may have been influenced by other evidence alleged to have been incompetent (*People v. Lindgren* (1980), 79 Ill. 2d 129, 142), we deem application of the waiver rule inappropriate with respect to the issue of the admissibility of the motive evidence, and the accompanying argument concerning the alleged gang-related motive for the killing of Willis. See *People v. Shack* (1947), 396 Ill. 285, 289; *People v. Rogers* (1932), 348 Ill. 322, 325-26.

It has long been recognized by this court that motive is not an essential element of the crime of murder, and the State has no obligation to prove motive in order to sustain a conviction of murder. (*People v. Shack* (1947), 396 Ill. 285, 292; *People v. Mangano* (1940), 375 Ill. 72, 76.) It is also well established, however, that any evidence which tends to show that an accused had a motive for killing the deceased is relevant because it renders more probable that the accused did kill the deceased. (*People v. Mitchell* (1984), 105 Ill. 2d 1, 10; *People v. Gougas* (1951), 410 Ill. 235, 238; *People v. Mangano* (1940), 375 Ill. 72, 76. See also *People v. Novotny* (1939), 371 Ill. 58, 61-62.) It is also the rule that in order for such evidence to be competent, it must, at least to a slight degree, tend to establish the existence of the motive relied upon or alleged. (*People v. Stewart* (1984), 105 Ill. 2d 22, 56; *People v. Branion* (1970), 47 Ill. 2d 70, 77; *People v. Gougas* (1951), 410 Ill. 235, 238-39.) Thus, when the State undertakes to prove facts which the State asserts constitute a motive for the crime charged, it must be shown that the accused knew of those facts. *People v. Wilson* (1987), 116 Ill. 2d 29, 52; *People v. Mitchell* (1984), 105 Ill. 2d 1, 10; *People v. Gougas* (1951), 410 Ill. 235, 239.

In *People v. Wilson* (1987), 116 Ill. 2d 29, this court held that the trial court erred in admitting evidence of an outstanding warrant for the defendant's arrest at the time the defendant allegedly murdered two police officers. The State had introduced the evidence to show that the defendant had a motive for killing the officers—to avoid arrest. This court there held improper admission of this evidence, absent evidence that the defendant knew he was wanted by the police. (116 Ill. 2d at 52.) Similarly, in cases in which the State offers an insurance policy as evidence that an accused had a motive to kill the deceased, this court has required, as a foundation for the

admission of such evidence, that the State provide evidence that the accused knew of the policy, knew it was valid, or believed it was valid, and knew that the accused would benefit therefrom. (*People v. Mitchell* (1984), 105 Ill. 2d 1, 10; *People v. Gougas* (1951), 410 Ill. 235, 239. See also *People v. Holtz* (1920), 294 Ill. 143; *People v. Erickson* (1980), 89 Ill. App. 3d 56.) In *Gougas*, this court observed that "[t]he policy *** standing alone in evidence before the jury, [does] little more than excite a suspicion of guilt and [is] not of the convincing character which satisfies the mind that [defendant] was motivated by any thought of gain from the insurance when he committed his homicidal assault on the deceased." 410 Ill. at 240.

In *People v. Weaver* (1982), 92 Ill. 2d 545, 562, this court held it improper for the State to offer evidence of a love affair as a motive for a murder when the State failed to offer any evidence establishing when the affair took place. We there observed that "[a] love affair whose embers have long since cooled is not exactly a motive for murder. Its value is likely to be outweighed by the unfair prejudice against the defendant the evidence engenders." 92 Ill. 2d at 562. See also *People v. Holtz* (1920), 294 Ill. 143; *People v. Harbold* (1984), 124 Ill. App. 3d 363, 376-77.

These cases all recognize that while it is entirely proper for the State to prove a motive, it is not enough that the State merely produce evidence of motive in the abstract, *i.e.*, that someone may have had a motive at some time to kill the deceased. The motive must be attributable to the defendant on trial at the time the crime was committed. This rule seeks to avert the very real danger that through the guise of motive evidence, the State may present to the jury highly inflammatory matter which, in actuality, is of little or no probative value. See *People v. Lindgren* (1980), 79 Ill. 2d 129, 140 (evi-

dence of other crimes allegedly committed by the defendant inadmissible if grounds for establishing its relevance are speculative).

It has also been recognized that, particularly in metropolitan areas, there may be strong prejudice against street gangs. (*People v. Parrott* (1976), 40 Ill. App. 3d 328, 331.) However, evidence of gang affiliation need not be excluded if it is otherwise relevant and admissible. (*People v. Calderon* (1981), 98 Ill. App. 3d 657, 661; *People v. Miller* (1981), 101 Ill. App. 3d 1029, 1034-35; *People v. Wadley* (1988), 169 Ill. App. 3d 1036, 1043-44.) It is generally held that evidence indicating the defendant was a member of a gang or was involved in gang-related activity is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. (*People v. Hairston* (1970), 46 Ill. 2d 348, 372; *People v. Miller* (1981), 101 Ill. App. 3d 1029, 1034-35; *People v. De Savieu* (1973), 11 Ill. App. 3d 529, 534-35.) Such evidence, however, is only admissible where there is sufficient proof that such membership or activity is related to the crime charged. *People v. Hairston* (1970), 46 Ill. 2d 348, 372; *People v. Wadley* (1988), 169 Ill. App. 3d 1036, 1043-44.

In the present case, the flaws in the State's motive theory are manifest. The State undertook to demonstrate that defendant was a member of the King Cobra street gang and that the killing of Virdeen Willis was an "assassination" carried out on behalf of Treadis Murray and the King Cobras in retaliation for Willis' intolerance of gang-related activity in prison. The only evidence admitted in support of this theory, however, indicated that there is a variety of gang-related activity in the Illinois penitentiary system, that Willis was intolerant of such activity in the prison where he was employed, and that Willis had had an altercation with Murray while Murray was an inmate. This evidence may well have been proba-

tive of whether defendant had a motive to kill Willis—but only if the evidence had been somehow tied to defendant. The evidence only indicated that defendant had been seen in an apartment on one occasion with Murray, that Murray may have been fairly influential in the neighborhood where the shooting occurred, and that defendant was talking with Murray at the time of defendant's arrest. This evidence, by itself, simply does not support a reasonable inference that defendant was an active member of the King Cobras, or that defendant was acting pursuant to the alleged vengeful designs of Murray or the King Cobras at the time he allegedly killed Willis. The trial record is barren of any evidence that defendant was aware that Willis was an assistant warden, let alone that Willis was tough on gang activity in prison. There was nothing to suggest that defendant knew Willis had had an altercation with Murray, or that Murray may have harbored animosity toward Willis. The only evidence even arguably tending to tie the alleged motive to defendant was the testimony that defendant had been seen, on certain occasions, in the presence of Treadis Murray. This is simply too slim a thread upon which to tie the State's theory of motive. As such, the inflammatory evidence of gang-related activity offered to support the "motive" theory was of little probative value and could do little more than "excite a suspicion of guilt" in the minds of the jurors. *People v. Gougas* (1951), 410 Ill. 235, 240.

The State argues that this case is similar to *People v. Jackson* (1982), 105 Ill. App. 3d 750. In *Jackson*, the court held that evidence of the defendant's gang membership was relevant to support the State's theory that defendant attacked the victim on an order from a gang leader, whom the victim, a prison employee, had earlier disciplined. In *Jackson*, however, unlike the present case, there was direct testimony that the defendant was a sub-

ordinate member of the gang and that it was not uncommon for a gang officer to order a subordinate member to do something. There was further testimony that subordinate gang members were subject to various forms of punishment for failing to obey orders of their superiors. In the present case, the evidence simply failed to establish that defendant was affiliated with the King Cobras. It goes too far to suggest that every person somehow associated with Treadis Murray is a member of the King Cobras, and thereby subject to the will of Murray and shares a common design or purpose with the gang. Treadis Murray's possible motive to kill Willis, absent other sufficient evidence, simply cannot be attributed to every person who associates with Murray.

The problem of the erroneous admission of this evidence was exacerbated by the prosecutor's arguments to the jury. It is true that the State is permitted wide latitude in closing argument and may argue to the jury facts and legitimate inferences drawn from the evidence. (*People v. Turner* (1989), 128 Ill. 2d 540, 560; *People v. Cisewski* (1987), 118 Ill. 2d 163, 175; *People v. Williams* (1968), 40 Ill. 2d 522, 530.) It is, however, improper for the prosecutor to argue assumptions or facts not based upon evidence in the case or to present to the jury what amounts to his own testimony. (*People v. Beier* (1963), 29 Ill. 2d 511, 517; *People v. Rothe* (1934), 358 Ill. 52, 56.) Furthermore, it is improper for the prosecutor to do or say anything in argument the only effect of which will be to inflame the passion or arouse the prejudice of the jury against the defendant, without throwing any light on the question for decision. (*People v. Dukes* (1957), 12 Ill. 2d 334, 342-43.) Improper remarks will not merit reversal unless they result in substantial prejudice to the defendant, considering the context of the language used, its relationship to the evidence, and its effect on the defendant's rights to a fair and impartial trial. *People v.*

*Thompkins* (1988), 121 Ill. 2d 401, 445; *People v. Pittman* (1982), 93 Ill. 2d 169, 176; *People v. Bryant* (1983), 94 Ill. 2d 514.

As noted above, the State's theory of gang-related motive, which it argued extensively to the jury in closing argument, was not supported by the evidence adduced at trial. The basic theme of the prosecutor's argument was the exposition of the State's theory of motive. The prosecutor argued that the killing of Willis was an "assassination" and that "[a] huge thorn in the side of the criminal gangs of this area was removed." The prosecutor continued that "[v]engeance was had by those individuals who had been incarcerated and were affected by the strict disciplinary stands that Virdeen Willis took against gang activity in the penitentiary. Street gangs flourish in this city and they flourish in the penitentiary system."

The prosecutor then stated to the jury that the Shamrock Lounge was located in an area of Chicago "controlled by a gang known as the King Cobras," that Treadis Murray was the "king of the King Cobras," and that Murray had a confrontation with Willis. The prosecutor then proceeded to argue:

"Several members of the King Cobras were present in this lounge. ***

When these individuals saw Virdeen Willis Jr. on their turf, not within the penitentiary which was Virdeen Willis Jr.'s turf, *** it was all over for this particular assistant warden.

You know that three of them came in, the defendant and two others, ***."

Later, the prosecutor continued along the same gang-related theme:

"We see her[e] today a man who is 37 years old, 37 years old still gang banging, still mixed up with a bunch of guys in a gang. And to say that gangs are not a part of this case is ridiculous, it's an integral part. It's unfortunate, *** that there are parts of this city that are

scared to death of these people, these masters of the neighborhood. They go out there acting like urban terrorists, taking what they want, instilling fear into every adult. Making children do things that they didn't want to do, \*\*\*."

As we noted above, the evidence admitted at trial simply failed to establish that defendant, or either of the other men who were with him in the Shamrock Lounge, were members of the King Cobras. There was nothing in the evidence from which it could be inferred that defendant was motivated by any desire to further the purposes of, or to seek vengeance on behalf of, either Treadis Murray or the King Cobras in general. The testimony of Rhonda Carraway indicated that Murray wielded a good deal of influence in the neighborhood where the shooting occurred, but this was still not enough to tie the State's "gang-related motive" theory to defendant. While, generally, it would not be error for the prosecutor to comment on the evil results of gang-related activity where such activity is related to the crime charged (*People v. Owens* (1984), 102 Ill. 2d 88, 105-06), the evidence failed to establish that the crime with which defendant was charged was gang-related. Absent evidence tending to tie the State's "motive evidence" to defendant, we perceive that the prosecutor's arguments could serve no purpose other than to "inflame the passion or arouse the prejudice of the jury against the defendant without throwing any light on the question for decision." *People v. Dukes* (1957), 12 Ill. 2d 334, 342-43.

We consider other alleged errors in the prosecutor's opening statement and closing argument. Defendant asserts that the prosecutor, in his opening statement, improperly told the jury, with reference to the Shamrock Lounge, that "[i]nside of that lounge were members of the King Cobras street gang in Chicago. One of the members of the King Cobra street gang is in court today

with us, the defendant here, Steven Smith." Defendant further asserts that the prosecutor improperly informed the jury that the evidence would show that Willis had, on a previous occasion, been threatened by certain individuals as he left the Shamrock Lounge.

As discussed above, the evidence actually adduced at trial simply did not support the inference that defendant was a member of the King Cobras. The trial court excluded evidence which may have tended to link defendant with the King Cobras. No evidence was presented to the jury suggesting that Willis had been threatened on any prior occasions while leaving the Shamrock Lounge. William Johnson was apparently prepared to testify at trial about the alleged threat, but the trial court precluded the State from eliciting such testimony at trial.

James A. Chrans, warden of Pontiac Correctional Center, did testify at the sentencing hearing that about two months prior to the shooting, Willis had commented to Chrans that a group of men had yelled at Willis from across the street while Willis and William Johnson were leaving the Shamrock Lounge. Chrans stated that Johnson had related that the men told Willis to "[g]et out of here. Don't come back on our turf." Neither Chrans nor Johnson testified as to who these men were or whether they were associated with defendant or the King Cobras, and, of course, none of this evidence was presented at the guilt phase of the trial.

An opening statement may include a discussion of the evidence and matters which may reasonably be inferred from the evidence. (*People v. Warmack* (1980), 83 Ill. 2d 112, 126.) "Counsel may summarily outline what he expects the evidence admissible at trial will show [citations], but no statement may be made in opening which counsel does not intend to prove or cannot prove." (*Gillson v. Gulf, Mobile & Ohio R.R. Co.* (1969), 42 Ill. 2d 193, 197; *People v. Robinson* (1987), 163 Ill. App. 3d

754, 776.) It is not, however, necessarily grounds for reversal that an opening statement refers to evidence which later proves to be inadmissible. Reversible error only occurs where the remarks are attributable to deliberate misconduct of the prosecutor and result in substantial prejudice to the defendant. *Miller v. John* (1904), 208 Ill. 173, 177; *People v. Robinson* (1987), 163 Ill. App. 3d 754; 776-77; *People v. Trass* (1985), 136 Ill. App. 3d 455, 465.

In the present case, we perceive no misconduct on the part of the prosecutor in the allegedly erroneous remarks made in his opening statement. The State stood ready to introduce evidence tending to support the assertion that defendant was at least associated with the King Cobras, and that Willis had indeed been threatened while exiting the Shamrock Lounge a few weeks prior to the shooting. This evidence was, however, later excluded by the trial court. Nor can we say that this comment concerning the threat, standing alone, would have resulted in substantial prejudice to defendant. The trial court instructed the jury that the opening statement was not part of the evidence and should not be considered as such. No evidence concerning the alleged threat was presented to the jury, and the prosecutor made no further reference to it at any time. With regard to defendant's alleged membership in the King Cobras, the comments, standing alone, may similarly have not warranted reversal. (See *People v. Trass* (1985), 136 Ill. App. 3d 455, 465.) But taken together with the incompetent evidence of the alleged gang-related motive and the similar remarks in closing argument, we consider additional factors weighing to the prejudice of defendant and further supporting our decision to reverse defendant's conviction.

Defendant next contends that it was improper for the prosecutor, in closing argument, to repeatedly refer to

Treadis Murray as the "king of the King Cobras." Defendant asserts that these comments were highly inflammatory and prejudicial. It may well be that these references were inflammatory, but we would note that it was defense counsel who initially elicited from Rhonda Carraway, on cross-examination, the testimony that Murray was the leader of the King Cobras. This was apparently done in an attempt to impeach her testimony. Defendant, therefore, will not be heard to complain of the prosecutor's comments relating to evidence which defendant himself elicited.

Defendant also complains of the following comments made by the prosecutor in closing argument:

> "Now Rhonda Carraway introduced you to Treadis Murray, king of the Cobras. And Rhonda Carraway told you that when she came down the street that day Treadis Murray grabbed her and said go on in there and get Herbert Stevens in there because I want to talk to him. And she told you that she went into the Shamrock Lounge to do that just because when the king of the Cobras tells you to do something, you do it. So she went in there and who did she see in there, she saw Herbert Stevens, and seated with him, the defendant, all dressed in black."

Defendant states that this summary of the evidence taken in the context of the prosecutor's comments about assassination and vengeance was an invitation to the jury to infer that Murray told Stevens to tell defendant to kill Willis. Of course, the prosecutor did not expressly argue that this was the case and there is no evidence whatsoever in the record to support such an inference. We view the above-quoted comments as nothing more than a summary of the evidence adduced at trial. The prosecutor drew no improper inferences from this evidence nor did he invite the jury to speculate on the possible substance of Murray's meeting with Stevens outside the Shamrock Lounge.

Finally, defendant argues that it was improper for the prosecutor to suggest to the jury that several of the State's witnesses had been threatened and forced to leave Chicago. The prosecutor stated that "every witness that had the guts to come in here and say what he or she saw, every witness that had the guts to point the finger at this defendant, every witness that had the guts to tell the police this is the guy, has had to leave town." The State responds that these remarks were simply comments on the courage and credibility of Rhonda and Debra Carraway and Hasan Ali. The State argues that the gist of these comments was that these witnesses were not motivated to falsely accuse defendant, but were, instead, motivated to flee, which "would have been a whole lot easier" than testifying against defendant. The State emphasizes that the prosecutor did not expressly tell the jury that the witnesses had been threatened by defendant, or by anyone. The State argues that the jury could well have drawn the inference that these witnesses would not move from Chicago and then return to falsely accuse defendant.

Both Rhonda and Debra Carraway testified that they had moved out of Chicago after the shooting of Willis and prior to trial. An objection was sustained to the prosecutor's attempt to elicit testimony from Rhonda Carraway that she feared for her life. Hasan Ali testified that he left Chicago because he was getting threats, although he did not testify as to either the nature or the source of those threats.

In the context of the evidence of gang-related activity and the remarks concerning gangs and "assassination" and "vengeance," the clear implication of the prosecutor's comments in this regard was that these witnesses had been forced, by threat or otherwise, to leave Chicago. Of course, any attempt to intimidate a witness is admissible as suggesting a consciousness of guilt (*People*

*v. Gambony* (1948), 402 Ill. 74, 80), but here the remarks were improper because there was nothing in the evidence suggesting that either Rhonda or Debra Carraway *had* to leave town or why they may have had to leave. With respect to Hasan Ali, there was no evidence of the source of the threats directed to him, and nothing suggesting that these threats were in any way related to the charges against defendant. Like the other errors in the State's closing argument, these comments, standing alone, may not have so prejudiced defendant as to warrant reversal. However, these comments compounded the fundamental flaws permeating this trial.

We conclude that the cumulative impact of the incompetent evidence of gang-related activity and of the prosecutor's remarks in this regard may well have prejudiced the jury and constituted a material factor leading to defendant's conviction. Under these circumstances, defendant is entitled to a new trial. See *People v. Whitlow* (1982), 89 Ill. 2d 322, 339-41; *People v. Lindgren* (1890), 79 Ill. 2d 129, 142-43; *People v. Romero* (1967), 36 Ill. 2d 315, 318-20.

Although not necessary to our disposition of this case, we will address one other issue we deem likely to arise on defendant's retrial. Defendant asserts that it was reversible error for the trial court to permit William Johnson to testify concerning the contents of a prison incident report. The report itself was admitted into evidence. Of course, the report is inadmissible unless the State establishes its relevance to the crime with which defendant was charged. If, on retrial, its relevance is established, it will be necessary to determine whether it is otherwise admissible. The incident report was apparently prepared by one Lieutenant Hart at Stateville Correctional Center on July 13, 1982. The report consists of an account of an incident in which Treadis Murray, who was at that time an inmate at Stateville, fought with another

inmate. According to the report, Virdeen Willis assisted a Lieutenant Taslar in breaking up the fight. In so doing, Willis handcuffed Murray. William Johnson was, at the time the report was prepared, a reviewing officer who reviewed and signed the report. Johnson apparently had no firsthand knowledge of the report. Defendant accordingly and correctly asserts that the report and Johnson's testimony from the report were hearsay. Defendant further argues that admission of this evidence violated his right to confront the witnesses against him. U.S. Const., amends. VI, XIV.

The State responds that the report was admissible under the business records exception to the hearsay rule. (Ill. Rev. Stat. 1985, ch. 38, par. 115—5.) The State further urges that confrontation clause concerns were not implicated in the admission of the prison incident report or in the testimony of William Johnson because the report was reliable, and, in fact, the prison was required by statute to keep such records. (Ill. Rev. Stat. 1985, ch. 38, par. 1003—5—1(a).) We conclude that the report was not admissible as a business record, under our business records statute, for the purpose of proving the particulars of the confrontation between Willis and Murray.

In criminal cases, the business records exception to the rule against hearsay is codified in section 115—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—5). That section provides in part:

> "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

The term 'business,' as used in this Section, includes business, profession, occupation, and calling of every kind." Ill. Rev. Stat. 1985, ch. 38, par. 115—5(a).

On its face, the prison incident report in the case before us appears to fall within the scope of the broad language of the statute. Johnson testified that the report was kept in the ordinary course of the business of the prison. By statute, the Department of Corrections is required to prepare and keep reports of such incidents. Johnson further testified that the report was prepared immediately after the incident with which it is concerned.

Defendant cites *Palmer v. Hoffman* (1943), 318 U.S. 109, 87 L. Ed. 645, 63 S. Ct. 477, in support of his contention that the prison incident report is inadmissible. *Palmer* involved a railroad grade crossing accident in which the plaintiff's car was struck by a train. Following the incident the engineer of the train involved made a statement to an assistant superintendent of the railroad. The statement apparently consisted of the engineer's account of the events surrounding the accident. The engineer died prior to the trial on the plaintiff's various causes of action against the defendants, trustees in reorganization of the railroad company. The defendants offered in evidence at trial the statement made by the deceased engineer. The trial court excluded the statement. The Second Circuit Court of Appeals held that the statement was inadmissible, reasoning that such statements are inherently unreliable. (*Hoffman v. Palmer* (2d Cir. 1942), 129 F.2d 976.) The court observed that the statement was "dripping with motivations to misrepresent." 129 F.2d at 991.

The United States Supreme Court affirmed. In so doing, the Court construed the Federal business records exception then codified at 28 U.S.C. §695. The language of section 695, at the time *Palmer* was decided, is virtually identical to the language of section 115—5 (Ill. Rev. Stat. 1985, ch. 38, par. 115—5). The Court held that the statement was not made "in the regular course" of business within the meaning of the Act, reasoning as follows:

> "It is not a record made for the systematic conduct of the business as a business. An accident report may affect that business in the sense that it affords information on which the management may act. It is not, however, typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls. The conduct of a business commonly entails the payment of tort claims incurred by the negligence of its employees. But the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business within the meaning of the Act." (*Hoffman*, 318 U.S. at 113-14, 87 L. Ed. at 649, 63 S. Ct. at 480.)

The Court explained that the business records exception was designed to facilitate the admission of records which experience had "shown to be quite trustworthy." If the Court were to accept the interpretation of the Act urged by the defendants, "the Act would cover any system of recording events or occurrences provided it was 'regular' and though it had little or nothing to do with the management or operation of the business as such. *** The probability of trustworthiness of records because they were routine reflections of the day to day operations of a business would be forgotten as the basis of the rule. [Citation.] Regularity of preparation would become the test rather than the character of the records and their ear-

marks of reliability [citation] acquired from their source and origin and the nature of their compilation." 318 U.S. at 113-14, 87 L. Ed. at 650, 63 S. Ct. at 480-81.

In *Bracey v. Herringa* (7th Cir. 1972), 466 F.2d 702, on which defendant relies heavily, the rationale of *Palmer* was applied to "prison records." *Bracey* involved a Federal civil rights action brought by a prison inmate against certain prison guards. In support of their motion for summary judgment, the guards offered certain "conduct reports" prepared by prison guards concerning the incident on which the plaintiff based his causes of action. The guards further offered a log kept by the guards during the time of the incident. In rejecting the guards' contention that the records were admissible as business records, the court reasoned:

"That prison guards may be held accountable under 42 U.S.C. §1983 for physical beatings of prisoners, deprivation of medical care, or deprivation of hygienic conditions, has been established for enough years that it can safely be assumed at least some guards write their reports on such occurrences with that possibility in mind." 466 F.2d at 704.

Similarly, in *United States v. Ware* (7th Cir. 1957), 247 F.2d 698, involving a prosecution for unlawful acquisition, concealment and possession of heroin, the court considered the admissibility of certain exhibits including memoranda prepared by Federal narcotic agents. The court concluded that the admission of certain exhibits consisting of envelopes in which the Federal narcotic agents had allegedly purchased heroin from the defendant and on which the agents had made various notations concerning the purchases and the circumstances under which the purchases were made was reversible error. The court reasoned that the memoranda on the envelopes prepared by the agents satisfied none of the requirements of the business records exception to the rule

against hearsay. (28 U.S.C. §1732; *Ware,* 247 F.2d at 700.) The court observed:

> "[E]ven if memoranda such as the ones in question are regularly prepared by law enforcement officers, they lack the necessary earmarks of reliability and trustworthiness. Their source and the nature and manner of their compilation unavoidably dictate that they are inadmissible under section 1732. They are also subject to the objection that such utility as they possess relates primarily to prosecution of suspected law breakers, and only incidentally to the systematic conduct of the police business." (247 F.2d at 700.)

The *Palmer* doctrine has thus been generally extended to exclude "business records" prepared with an eye toward litigation when offered by the party at whose behest such records were made. See *United States v. Smith* (D.C. Cir. 1975), 521 F.2d 957, 965-66 (and cases cited therein).

Indeed, our business records statute specifically provides that:

> "(c) No writing or record made in the regular course of any business shall become admissible as evidence by the application of this Section if:
> \*\*\*
> (2) Such writing or record has been made by anyone during an investigation of an alleged offense or during any investigation relating to pending or anticipated litigation of any kind." (Ill. Rev. Stat. 1985, ch. 38, par. 115—5(c)(2).)

Thus writings or records relating to a police investigation are generally excluded from the business records exception to the rule against hearsay, even though they may be kept "in the regular course" of law enforcement "business." (See *People v. Carpenter* (1963), 28 Ill. 2d 116, 120-22; *People v. White* (1988), 167 Ill. App. 3d 439, 442; *People v. Seider* (1981), 98 Ill. App. 3d 175, 191; *People v. Richardson* (1977), 48 Ill. App. 3d 307, 310-11.)

This exclusion certainly extends to reports or records of observations of police officers or other law enforcement personnel at the scene of a crime or apprehension of the accused. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §803.13 (5th ed. 1990).) The information contained in such reports or records may well call into question the motivation, the recall, or the soundness of conclusions of the author of the report or the person providing the information contained in the report. (See *State v. Bertul* (Utah 1983), 664 P.2d 1181, 1185; *United States v. Ware* (7th Cir. 1957), 247 F.2d 698, 700; *United States v. Orozco* (9th Cir. 1979), 590 F.2d 789, 793.) Such reports or records, by themselves, thus generally lack the earmarks of trustworthiness and reliability which are the true basis for the business records exception to the rule against hearsay and which business records are assumed to ordinarily have.

We conclude that prison incident reports like the one before us in this case lack the necessary earmarks of trustworthiness and reliability generally attendant to regularly kept business records. Similar to police reports, these incident reports generally record disciplinary infractions by inmates and are made with an eye toward some form of subsequent discipline. As aptly observed in *Bracey v. Herringa,* 466 F.2d at 704, confrontations between prison employees and inmates often give rise to civil rights litigation against the employees, and it can safely be assumed that the employees prepare their reports with this possibility in mind. See 5 J. Wigmore, Evidence §1527 (Chadbourn rev. 1974) (it is a fair limitation on the business records exception to exclude material where the existence of a fairly positive counter motive to misrepresent appears in a particular instance). See also E. Cleary, McCormick on Evidence §308 (2d ed. 1972).

We further find it of little consequence that the Department of Corrections was required by statute to keep such reports. Section 3—5—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1003—5—1) requires the Department of Corrections to maintain a master record file on each person committed to it. Each file is to contain, among other things, "reports of disciplinary infractions and disposition." (Ill. Rev. Stat. 1985, ch. 38, par. 1003—5—1(a)(5).) But the statute by itself does not account for the veracity of the information contained in such reports. This statute may serve as some authority for the admission of reports or records of routine, ministerial, objective and nonevaluative matters made in a nonadversarial setting when the circumstances of the preparation of the reports or records otherwise indicate their trustworthiness. (*People v. Flippen* (1977), 46 Ill. App. 3d 246, 250. See also *United States v. Orozco* (9th Cir. 1979), 590 F.2d 789, 793 (Congress, in excluding " 'matters observed by ... law enforcement personnel' " from coverage of public records exception to hearsay rule did not intend to exclude routine, nonadversarial matters such as recordation of license numbers of all vehicles which pass through border station), quoting Fed. R. Evid. 803(8).) The statute does not, however, cloak incident reports like the one before us with sufficient indications of trustworthiness and reliability to satisfy the underlying purpose of the business records exception. The truth of the matters contained in these types of reports should be accounted for in some other manner, such as testimony by a witness to the matters contained therein. We therefore hold that prison incident reports are not admissible under the business records exception to the rule against hearsay when offered to prove the particulars of disciplinary infractions or of confrontations between prison employees, or law enforcement personnel and prison inmates. We need not, and do

not, pass on whether the report is admissible for other purposes, such as to demonstrate that Murray was an inmate at Stateville Correctional Center.

The State cites *People v. Jackson* (1968), 41 Ill. 2d 102, and *People v. Flippen* (1977), 46 Ill. App. 3d 246, for the proposition that prison and jail records made pursuant to statutory provisions are admissible under the business records statute. In *Jackson,* this court held admissible as a business record the defendant's inmate history card containing data relating to the defendant's history, his picture, his fingerprints and the reason for his admission to prison. The card also included a medical notation describing the defendant's condition as good. The card otherwise satisfied the statutory requirements for admission as a business record. Despite the fact that the business records statute specifically excluded "medical records," this court observed that the medical notation on the card was essentially descriptive of the defendant and that "in view of the contents, mode of preparation and purport, the card should not come within the purview of the medical records exclusion." (*Jackson,* 41 Ill. 2d at 114.) In *Flippen,* the appellate court held admissible certain prison records including photographs, a certified mittimus, a "dress-out" slip, and parole papers. The court, relying on section 115—5 of the Code of Criminal Procedure and section 3—5—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1975, ch. 38, pars. 115—5, 1003—5—1), held these items admissible to prove a prior conviction. *Flippen,* 46 Ill. App. 3d at 249-51.

The items held admissible as "business records" in *Jackson* and in *Flippen* clearly satisfied both the letter and the purpose of the business records exception. These items concerned routine, ministerial matters not prepared in the adversarial context of a true confrontation between law enforcement personnel and the accused. They were kept pursuant to statute in the regular course

of the operations of the respective prisons, and the circumstances of their preparation and retention served as sufficient guarantees of their accuracy. Further, they were not admitted as evidence of the details of disciplinary infractions or of true confrontations between inmates and prison employees. As we noted above, the prison incident report at issue in this case is in a different category altogether. While we may not be willing to describe the report as "dripping with motivations to misrepresent" (*Hoffman*, 129 F.2d at 991), it is certainly of such nature that defendant should be given the opportunity to test the veracity of its contents through the adversarial process, especially through the technique of cross-examination.

It is, of course, not our place to exclude such reports from the business records statute if the legislature put them in. But we think that the specific exclusion of matters relating to criminal investigations, litigation or anticipated litigation evidences a very real concern about admission of such records and reports when their accuracy is untested by the adversarial process. The prison incident report in the case at bar lacks the reliability which business records are assumed to ordinarily have.

We also believe that admission of such reports, without more, would give rise to serious confrontation clause concerns. (See *People v. Smith* (1967), 38 Ill. 2d 13; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §803.13, at 665-66 (5th ed. 1990).) In criminal prosecutions, the constitutional right of the accused to confront the witnesses against him and its corollary right of cross-examination act independently to restrict the types of hearsay evidence which may be admitted against a defendant in certain circumstances. The sixth amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses

against him." (U.S. Const., amend. VI.) This right is obligatory on the States through operation of the fourteenth amendment. (U.S. Const., amend. XIV; *Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065. See also Ill. Const. 1970, art. I, §8 ("In all criminal prosecutions, the accused shall have the right *** to meet the witnesses face to face").) The main and essential purpose of the confrontation clause is to secure for an accused person the opportunity of cross-examination. (5 J. Wigmore, Evidence §1395 (Chadbourn rev. 1974); M. Graham, Cleary & Graham's Handbook of Illinois Evidence §807.1 (5th ed. 1990).) Indeed, it would appear that the fundamental explanation for excluding such materials as those described in section 115—5(c) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 115—5(c)) is that substantial rights under the confrontation clauses of both the United States and Illinois Constitutions, especially the right of cross-examination, would be severely prejudiced when the information in the report or record calls into question the motivation and the accuracy of perception, recall or soundness of conclusions of the person who prepared the report or who provided the information contained therein. (*People v. Smith* (1967), 38 Ill. 2d 13, 15. See also *State v. Bertul* (Utah 1983), 664 P.2d 1181, 1185; *Chambers v. Mississippi* (1973), 410 U.S. 284, 296, 35 L. Ed. 2d 297, 309, 93 S. Ct. 1038, 1046 (right of cross-examination is essential to a fair trial). See generally M. Graham, Cleary & Graham's Handbook of Illinois Evidence §§803.13, 807.1 (5th ed. 1990); 5 J. Wigmore, Evidence ch. 47 (Chadbourn rev. 1974).) Of course, this guarantee has never been interpreted to be an absolute bar to all hearsay evidence offered against a criminal defendant.

The United States Supreme Court has recognized that the confrontation clause and the evidentiary rule against hearsay "stem from the same roots," but the

Court has declined to equate the two. (*Dutton v. Evans* (1970), 400 U.S. 74, 87, 27 L. Ed. 2d 213, 226, 91 S. Ct. 210, 219.) In assessing the validity of confrontation clause attacks on the admission of hearsay evidence the Court has manifested "a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.' " (*Dutton*, 400 U.S. at 89, 27 L. Ed. 2d at 227, 91 S. Ct. at 220.) The Supreme Court has indicated that "firmly rooted" exceptions to the rule against hearsay, such as the co-conspirator exception, may as such carry with them sufficient "indicia of reliability" that a court need not make any independent inquiry into the trustworthiness of matters falling within such exceptions prior to their admission into evidence. (*Ohio v. Roberts* (1980), 448 U.S. 56, 66, 65 L. Ed. 2d 597, 608, 100 S. Ct. 2531, 2539; *Bourjaily v. United States* (1987), 483 U.S. 171, 183, 97 L. Ed. 2d 144, 157, 107 S. Ct. 2775, 2782. See also *United States v. Inadi* (1986), 475 U.S. 387, 89 L. Ed. 2d 390, 106 S. Ct. 1121; *People v. Goodman* (1980), 81 Ill. 2d 278.) Hearsay declarations not falling within a "firmly rooted" exception may nonetheless be admitted if they are shown to possess "particularized guarantees of trustworthiness." (*Ohio v. Roberts* (1980), 448 U.S. at 66, 65 L. Ed. 2d at 608, 100 S. Ct. at 2539. See generally M. Graham, Cleary & Graham's Handbook of Illinois Evidence §807.1 (5th ed. 1990).) While the business records exception to the rule against hearsay may indeed be a "firmly enough rooted" exception, we do not find that prison incident reports like the one at issue in this case fit neatly into that exception. The admission of such reports is certainly not consistent with the underlying reason for the exception. We further find that these types of reports, in general, may not, by themselves, bear sufficient "indicia of reliability" to satisfy the requirements

of the confrontation clauses. Something more in the way of "particularized guarantees of trustworthiness" is needed.

In sum, we hold that the competent evidence adduced at trial was not so unsatisfactory as to raise, as a matter of law, a reasonable doubt of defendant's guilt. However, the weight the jury attributed to that evidence may well have been influenced by the incompetent and inflammatory evidence and accompanying prosecutorial remarks concerning gang-related activity and motive. The cumulative impact of this incompetent evidence and the prosecutor's accompanying remarks may well have improperly prejudiced the jury against defendant and have constituted a material factor leading to his conviction. Accordingly, defendant is entitled to a new trial.

Defendant's conviction of the murder of Virdeen Willis, Jr., is reversed and this cause is remanded to the circuit court of Cook County for a new trial.

*Reversed and remanded.*

JUSTICE MILLER, dissenting:

The court finds that irrelevant evidence of motive was introduced at the defendant's trial, and the court holds that the error in the admission of the evidence requires that the defendant be granted a new trial. I do not agree with the majority's conclusions. In my view, the challenged evidence was relevant, and admissible. If error occurred in the proceedings below, it was in the erroneous exclusion of similar evidence offered by the State. For those reasons, I respectfully dissent.

The victim, Virdeen Willis, Jr., was assistant warden of Pontiac Correctional Center. On June 30, 1985, Willis and a friend, Robbin Howland, drove to Chicago and went to the Shamrock Lounge, a tavern that was owned by Willis' cousin. During the evening, the defendant, Herbert Stevens, and Robert Spade entered the tavern and

occupied a table directly behind Willis and Howland, who were sitting at the bar. Alarmed by the behavior of the defendant and his companions, the bartender armed himself with a handgun that was kept on the premises. At one point, Stevens was summoned outside to talk to Treadis Murray, the leader of the King Cobra street gang. Stevens later returned with several other men. The defendant, Stevens, Spade, and the others left sometime following that.

Assistant Warden Willis and Howland left the tavern with Willis' cousin around 9 p.m. According to the testimony of an eyewitness, the defendant approached Willis and shot him once in the neck with a handgun. As Willis lay on the ground, the defendant waved the gun back and forth several times and then fled. The defendant was arrested several days later and charged with Willis' murder; at the time of his arrest, the defendant was talking with Treadis Murray.

In addition to the evidence described above, the trial judge admitted, over the defendant's objection, testimony that Assistant Warden Willis did not tolerate gang-related activity by inmates and was known as a strict disciplinarian, and that members of the King Cobra street gang were incarcerated in facilities of the Department of Corrections. As assistant warden of Pontiac Correctional Center, Willis was in charge of security for that institution. Also over a defense objection, the trial judge admitted evidence of an incident that occurred in July 1982 and that involved Murray and Willis. At the time, Murray was an inmate of Stateville Correctional Center, and Willis was employed there. After a fight broke out between Murray and another inmate, Willis, who was then a captain, assisted another officer in subduing the two inmates.

Evidence is relevant if it tends " 'to make the existence of any fact that is of consequence to the determina-

tion of the action more probable or less probable than it would be without the evidence.' " (*People v. Monroe* (1977), 66 Ill. 2d 317, 322, quoting Fed. R. Evid. 401.) Although motive is not an element of the offense of murder, evidence of motive may be relevant as proof of the identity of the offender. (*People v. Mangano* (1940), 375 Ill. 72, 76; see *People v. Novotny* (1939), 371 Ill. 58, 62.) In the present case, the State sought to show the street gang's enmity for the victim, and the defendant's association with the gang.

I do not agree with the majority's conclusion that the evidence of motive presented by the State in the case at bar was irrelevant in the absence of proof that the defendant was himself aware of all the facts and circumstances giving rise to the alleged motive. (141 Ill. 2d at 56.) In support of that rule the majority relies primarily on *People v. Wilson* (1987), 116 Ill. 2d 29, 52, *People v. Mitchell* (1984), 105 Ill. 2d 1, 10, and *People v. Gougas* (1951), 410 Ill. 235, 239. In each of those cases, however, only the conduct of the particular defendant was at issue; in none of the cases was the contention made that the defendant may have shared, or have been acting in accordance with, the purpose or motive of another person.

As the majority opinion later acknowledges, evidence of street gang activity may be relevant as proof of common purpose or design. (141 Ill. 2d at 58.) In the present case, the trial evidence showed that the defendant and two companions entered the tavern after Assistant Warden Willis was already there and took a table next to where Willis was sitting. Later, Treadis Murray, the leader of the King Cobra street gang, summoned one of the defendant's companions outside. The defendant left the tavern before Willis did and apparently waited for Willis to leave. The defendant was with Murray at the time of his arrest. Other evidence showed that Willis did

not tolerate gang activity by inmates and that Murray, while an inmate, had been physically subdued by Willis. This testimony was sufficient to establish the defendant's involvement with Murray and the street gang and, moreover, suggested the existence of a motive for the gang's hostility toward the victim.

To be sure, the evidence of Assistant Warden Willis' prior encounter with Treadis Murray was presented through a prison discipline report, which, as the majority opinion correctly determines, was not admissible under the business records exception to the hearsay rule. (141 Ill. 2d at 74.) But defense counsel failed to make a hearsay objection at trial to the witness' use of the report, and the evidence, though hearsay, may be "considered and given its natural probative effect." (*People v. Akis* (1976), 63 Ill. 2d 296, 299.) In view of the limited purpose for which the report was used—to provide the bare outlines of the incident—I do not believe that the failure of the report to satisfy the requirements of the business records exception (see Ill. Rev. Stat. 1987, ch. 38, par. 115—5) must deprive it of all evidentiary value. See *People v. Collins* (1985), 106 Ill. 2d 237, 263.

Finally, any doubts concerning the admissibility of the evidence challenged by the defendant are dispelled by an examination of certain evidence that the trial judge erroneously excluded from the jury's consideration. In the present case, the trial judge sustained defense counsel's objections, apparently on grounds of relevance, to testimony that would have provided additional support for the State's theory of the case. These adverse rulings denied the prosecution the opportunity to establish several assertions made in opening statement and prevented the prosecution from further demonstrating the relevance of the evidence that was admitted.

The trial judge refused to allow the State to introduce testimony of threats that had been made against

Assistant Warden Willis during an earlier visit to the Shamrock Lounge. As Willis was leaving the tavern on that occasion, several persons addressed him by name and told him that the neighborhood was theirs and that he should leave the area. At that time, Willis was accompanied by another corrections officer. In addition, the trial judge sustained a defense objection to the admission of some of the items found by the police in their search of the defendant's residence. The court excluded a sheaf of papers, 77 pages in all, containing regulations, or by-laws, of the King Cobra street gang and other information pertaining to the gang. The court also excluded two invitations to King Cobra functions that had been held in March and April 1985.

The testimony excluded by the court would have provided further evidence of the danger posed to Assistant Warden Willis by his presence at the tavern, and of the defendant's association with the King Cobra gang. If there was error at trial, it occurred not because the trial judge admitted too much evidence, but because he admitted too little.

I would conclude that the State's evidence of motive was relevant, and admissible. The defendant's trial attorney correctly understood that the primary issue in the case was the strength of the identification made by Debra Carraway, an eyewitness to the shooting. The jury was made aware of Carraway's possible reasons for falsely implicating the defendant, and of her delay in coming forward with her testimony. Defense counsel raised only general claims of error in the defendant's motion for a new trial, and, at the hearing on the motion, counsel declared that the trial had been "fairly error free." I agree with that assessment. Finding no reversible error in the proceedings below, I would affirm the defendant's conviction and sentence.