THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MYLES LINTON, Defendant-Appellant.

First District (1st Division)   No. 1—91—2282

Opinion filed March 2, 1993.

Michael J. Pelletier and Martin Carlson, both of State Appellate Defender's Office, and Winston & Strawn, both of Chicago (Patrick Hess, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Lou Anne Corey, and Jason H. Payne, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

On March 16, 1990, defendant Myles Linton was charged with two counts of attempted first-degree murder and two counts of aggravated assault. Before trial, the State declared a *nolle prosequi* as to the aggravated assault charges. Following a jury trial in the circuit court of Cook County, defendant was found guilty of one count of at-

tempted first-degree murder and was sentenced to 18 years' imprisonment. Defendant now appeals. For the following reasons, we affirm.

The record on appeal discloses the following facts. At defendant's trial, Chicago police officers Matthew Brandon, Robert Wallace and Sergeant Michael Drawhorn gave similar testimony regarding the events of February 11, 1990. On the night in question, these witnesses were assigned to public housing south. At about 11:56 p.m., they responded to a radio call concerning a loud party and gang disturbance at 3519 South Federal, which is part of the Stateway Gardens housing complex.

After dispersing the party, the police heard gunshots coming from the south and saw several people running toward them from that direction. As they ran by, these people told the policemen that people were shooting. Officer Wallace testified that he received a partial clothing description of a man wearing a sports team jacket with a team name on the back that began with the letter "B."

The police headed south. At 3653 South Federal, they saw a group of people at the top of a ramp leading into the building and a person at the base of the ramp. Officers Brandon and Wallace testified that the lighting in the area was adequate, though Officer Wallace could not see the face of the person at the base of the ramp. Sergeant Drawhorn could see the silhouette of the person at the bottom of the ramp.

When the police were approximately 70 to 90 feet from the ramp, they heard someone yell "here they come, folks." According to Officer Brandon, "folks" is a term used by the members of the Disciples street gang. Officer Wallace testified that "folks" are friendly to the Disciples, whereas "people" are fighting the gang. Over defendant's objection, Officer Brandon testified that 3653 South Federal was marked with graffiti that included the Disciples' gang sign. Officers Brandon and Wallace testified that the yell came from the person at the base of the ramp.

After hearing this yell, Officers Brandon and Wallace saw the person at the base of the ramp raise his arm, heard gunshots and saw at least four muzzle flashes aimed in their direction. Sergeant Drawhorn saw the person at the edge of the ramp point a pistol towards Officers Brandon and Wallace, saw the muzzle flashes in their direction and heard the gunshots. Officer Wallace moved to his left and dropped to a prone position 90 feet from the ramp. Officer Brandon was standing approximately 45 feet in front of and 20 to 30 feet to the right of Officer Wallace. Sergeant Drawhorn was 30 to 35 feet to the left of Officer Brandon. Officers Brandon and Wallace returned

fire. All three policemen testified that the people at the top of the ramp left when the gunfire started.

The three policemen then saw the person at the base of the ramp crawl up the ramp and behind a wall on the side of the ramp. They ran towards this person as he crawled up the ramp. Officer Wallace never lost sight of this person as he went up the ramp. Sergeant Drawhorn lost sight of the person when the person dropped behind the wall, but testified that Officer Brandon should have been able to see defendant at that point. Officer Brandon testified that he lost sight of the person for approximately two seconds when the person dropped behind the wall.

The police saw the person crawl into a cubbyhole and come to rest; at trial, the policemen identified that person as defendant. The policemen also testified that defendant was holding a gun in his right hand. Officer Brandon ordered defendant to throw the gun out; defendant complied. Officer Brandon picked up the gun, identified as a nine-millimeter semi-automatic pistol. According to Officer Brandon, the gun was warm, had traces of gunpowder around its ejector and the clip was empty of bullets.

The police searched defendant and handcuffed his arms behind his back. Defendant told the police he had been shot in the arm. According to Officer Brandon, to examine defendant's arm, the police pulled defendant's clothes down around his arms such that they made contact with defendant's hands. Officer Brandon examined the ramp area and retrieved 12 shell casings from the base of the ramp.

Officer Robert Smith testified that he was assigned to the firearms identification section of the Chicago police department crime laboratory; defendant stipulated to Officer Smith's qualifications. Officer Smith opined that 4 of the 12 shell casings recovered from the base of the ramp at 3653 South Federal had been fired by the pistol recovered from defendant. The other eight shells had been fired by another gun.

The State rested. Defense counsel orally moved for a directed verdict. Defense counsel argued in part that while the evidence may suggest the defendant was guilty of some offense, the State failed to prove that defendant intended to kill the police officers. The trial court denied the motion.

Defendant called Robert Berk, a trace evidence analyst for the Chicago police department crime laboratory, as his first witness. Berk testified that when a firearm is discharged, a cloud of smoke engulfs the shooter's hands. A gunshot residue test, in which cotton swabs moistened with nitric acid are applied to a suspect's hands and then

examined microscopically, may reveal trace elements that have adhered to the suspect's hands from discharging a firearm. Berk testified that a gunshot residue test was performed on defendant's hands. Berk opined that the test results indicated three possibilities: (1) defendant had not fired a gun; (2) any gunshot residue on defendant's hands was removed before the test; or (3) defendant shot a gun that did not deposit residue.

Berk testified that gunshot residue can be dissipated from the hands in several ways. If a shooter were to rub his hands on his clothing, a significant amount of residue would be dissipated. If the shooter were able to wash his hands, it would remove almost all the residue. Residue would also be dissipated if the shooter crawled on his hands and feet. Berk stated that defendant's hands were not swabbed until 2 hours and 19 minutes after his arrest, and that a significant amount of residue can be removed through normal activity in that time.

Berk further testified that he had not test-fired the nine-millimeter pistol at issue to determine whether it would deposit residue. Berk also indicated that wind could cause a cloud of smoke emitted by a gun to blow away from a shooter's hands.

Shanta Hayes testified that on the night in question, she saw defendant at a party at 3517 South Federal. She testified that defendant was drunk and that she and another woman decided to walk defendant to his nearby aunt's house. The three heard gunshots as they approached 3653 South Federal; Hayes did not see defendant fire a gun. Upon hearing the gunshots, Hayes ran away and did not see in which direction defendant went.

Chicago police officer Joseph Moran, an evidence technician, testified that he swabbed defendant's hands for the gunshot residue test at about 2:15 a.m. According to Officer Moran, defendant identified himself as Romario Williams and told Moran he could not remember the last time he washed his hands. Officer Moran stated that defendant's hands appeared soiled at the time they were swabbed.

Defendant testified on his own behalf. The first portion of his testimony is substantially similar to Ms. Hayes' testimony. Defendant then testified that upon hearing the gunshots at 3653 South Federal, he ran up the ramp leading into the building. He testified that he did not have a gun. After running up the ramp, he realized he had been shot in the arm and hid in the cubbyhole. Defendant could hear more shooting and people talking nearby. According to defendant, he laid his hand down on the ground and felt a gun, but did not pick up the gun.

Defendant then testified that Officer Brandon arrived at the cubbyhole, saw the gun and kicked it away from defendant. Defendant admitted that he was wearing a black "Bruins" starter jacket on the night in question. Defendant told the police that four people had been standing nearby shooting guns, but the police did not ask whether the nine-millimeter pistol belonged to one of these people. Defendant also told the police that he had been shot in the arm, but the police did not remove his clothing because when they tried to do so, they realized they could not do so without removing defendant's handcuffs.

Defendant admitted that he identified himself to the police as Romario Williams because there was a warrant outstanding for his arrest and he did not want to go to jail. Defendant admitted that he was convicted of possession of a controlled substance with intent to deliver in 1990.

In rebuttal, Chicago police officer Patrick Mulligan testified that on the night in question, he was called to 3653 South Federal, whereupon he took defendant to the hospital. Officer Mulligan observed defendant remove his own jacket and sweat shirt and wipe his hands on his thighs. Officer Mulligan also escorted defendant to the washroom.

Detective George Carey testified that he interviewed defendant at the hospital. Defendant identified himself as Romario Williams and described himself as a bystander to gunfire between the gangs and police.

Following closing arguments and jury instructions, the jury found defendant guilty of the attempted murder of Officer Brandon and not guilty of the attempted murder of Officer Wallace.

I

Defendant initially contends that the failure of his counsel to tender a jury instruction on the lesser included offense of aggravated assault amounts to a denial of his right to effective assistance of counsel, guaranteed by the sixth amendment to the United States Constitution. Typically, to prove ineffective assistance of counsel, defendant must prove both prongs of the test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. (*People v. Albanese* (1984), 104 Ill. 2d 504, 526 N.E.2d 1246.) Defendant must demonstrate that his counsel committed errors so serious that, judged by an objective standard, his performance was incompetent and the errors caused prejudice to defendant without which there is a reasonable probability that the result of the proceedings would have been different. (*Strickland*, 466 U.S. at 687-94, 80 L.

Ed. 2d at 693-98, 104 S. Ct. at 2064-68; *People v. Collins* (1985), 106 Ill. 2d 237, 273, 478 N.E.2d 267.) There is a strong presumption that trial counsel's performance is within the "wide range of reasonable professional assistance," and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065, quoting *Michel v. Louisiana* (1955), 350 U.S. 91, 101, 100 L. Ed. 83, 93, 76 S. Ct. 158, 164.

The decision not to tender a jury instruction on a lesser-included offense is generally a matter of trial strategy. (*People v. Barnard* (1984), 104 Ill. 2d 218, 231-32, 470 N.E.2d 1005, 1009-10; *People v. Canet* (1991), 218 Ill. App. 3d 855, 862-63, 578 N.E.2d 1146, 1151; *People v. Palmer* (1989), 188 Ill. App. 3d 414, 428, 545 N.E.2d 743, 754.) The *Canet* court noted that the Seventh Circuit granted relief to the defendant in *Barnard* because the jury appeared confused, but declined to follow the Federal decision. *Canet*, 218 Ill. App. 3d at 862-63, 578 N.E.2d at 1151 (discussing *United States ex rel. Barnard v. Lane* (7th Cir. 1987), 819 F.2d 798).

In addition, unlike *Barnard*, defendant does not point to evidence of jury confusion. The cases defendant relies upon concern a trial court's refusal to give a tendered lesser-included offense instruction rather than defense counsel's decision not to tender the instruction. *People v. Ross* (1992), 226 Ill. App. 3d 392, 394-96, 589 N.E.2d 854, 855-56; *People v. Krueger* (1988), 176 Ill. App. 3d 625, 629, 531 N.E.2d 396, 399.

■ Defendant claims that his counsel's argument for a directed verdict shows that the decision not to tender an aggravated assault instruction was a mistake, not a strategy. The record shows that defendant's attorney argued that the State may have proved defendant guilty of some offense other than attempted murder. That argument seems to support, rather than rebut, the presumption that defense counsel pursued the strategy of forcing the jury to find defendant guilty of attempted murder or acquit him entirely. Indeed, the record shows that defendant was found guilty of only one of two counts of attempted murder, which may arguably indicate that such a strategy was partially successful.

Defendant also argues that his trial counsel acknowledged that the decision was a mistake by listing it as an example of ineffective assistance of counsel in the post-trial motion. Yet trial counsel did not state that the decision was a mistake in the post-trial motion; rather, trial counsel stated that he should have tendered the instruction. Trial counsel may have come to believe that the decision not to tender was

a mistake after defendant was found guilty, but hindsight does not remove the decision from the realm of strategy. Defendant has failed to present any evidence to rebut the presumption that the failure to tender the instruction was an intentional strategy.

Defendant argues that this is not a case where introducing an instruction would have been inconsistent with his defense (as in *Palmer*) or where defense counsel questioned the consequences of tendering the instruction (as in *Barnard*). Defendant argues in his brief that

> "defense counsel here conceded Myles Linton's guilt of something and then mistakenly failed to tender an instruction regarding that something: aggravated assault."

Assuming *arguendo* that defense counsel made such a concession, the record shows that this was not done before the jury. Moreover, we decline to hold that defense counsel was constitutionally required to submit an instruction on an offense where counsel concedes defendant's guilt of that offense.

In sum, defendant has failed to show that his attorney's conduct fell below an objective standard of reasonableness or that he otherwise received ineffective assistance of counsel in this case.

II

Defendant contends that the State failed to prove him guilty beyond a reasonable doubt. This court will disturb a criminal conviction only when the evidence is so improbable or unsatisfactory that it raises a reasonable doubt as to defendant's guilt. (*E.g., People v. Brandon* (1990), 197 Ill. App. 3d 866, 874, 557 N.E.2d 1264, 1269.) The standard on appeal is whether any rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the offense beyond a reasonable doubt. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43-44, 535 N.E.2d 889, 903.) In this case, the State was required to prove that defendant committed an act which constituted a substantial step towards the commission of a murder with the intent to commit murder. (See *People v. Garrett* (1991), 216 Ill. App. 3d 348, 353, 576 N.E.2d 331, 335.) Defendant contends that the State failed to prove the element of intent.

Defendant concedes that this court has previously held that the firing of a gun at a victim evinces the requisite intent to kill. (See *People v. Wilson* (1991), 224 Ill. App. 3d 364, 367, 586 N.E.2d 547, 549.) Nevertheless, defendant claims that the distance between the shooter and the victims, the lighting of the scene, the time of day, the victims' lack of sensation of a bullet passing near them and the dis-

tance between the police officers operate to negate any inference of intent. Defendant also contends that there was no evidence that the shooter varied his aim.

■ It is the province of the jury as the trier of fact to determine whether the requisite intent has been proved. (See *People v. Turcios* (1992), 228 Ill. App. 3d 583, 598, 593 N.E.2d 907, 918.) In this case, the jury heard evidence that the person at the base of the ramp shouted to others when the police approached and then fired in the direction of two of the officers, as evidenced by muzzle flashes. The jury heard evidence that Officer Brandon was the officer closest to the shooter and that Officer Brandon arrived on the scene shortly before the other officers. The jury also heard evidence indicating that defendant was the shooter. The jury heard evidence that defendant fired in the direction of Officers Brandon and Wallace and that Officer Wallace then moved to his left and dropped to the ground before returning fire. Thus, in finding defendant guilty of only one of the two counts of attempted murder, it appears that the jury weighed the factors which defendant argues above.

In sum, a rational trier of fact could conclude that defendant was guilty of the attempted murder of Officer Brandon.

### III

Finally, defendant contends that the trial court denied him a fair trial by admitting testimony implying he was a member of a street gang. Defendant relies almost exclusively on *People v. Smith* (1990), 141 Ill. 2d 40, 565 N.E.2d 900. That case suggests that the State cannot impute a gang-related motive to a defendant simply because he had been seen with a known gang member. (See *Smith*, 141 Ill. 2d at 58-59, 565 N.E.2d at 907-08.) Generally, evidence of gang membership or activity must be related to the crime charged to be admissible. See *Smith*, 141 Ill. 2d at 58, 565 N.E.2d at 907.

■ In this case, the record shows that the police went to 3519 South Federal due to a radio call indicating a loud party and gang disturbance. After dispersing the party, the police heard gunfire coming from the south and proceeded to 3653 South Federal, where they saw a group standing at the top of a ramp and a person at the bottom of the ramp. Immediately before the shooting, the shooter at the bottom of the ramp (later identified as defendant) used gang terminology in alerting the others as they stood in a location where gang signs were present. It would appear that the evidence tended to suggest that the shooting was gang-related in a far more direct manner than in *Smith*.

Thus, there was no error in admitting the evidence in this case. See *People v. Nichols* (1992), 235 Ill. App. 3d 499, 507-09.

Even if the introduction of this evidence could be considered error, defendant's partial acquittal indicates that defendant was not unfairly prejudiced by the introduction of this evidence, thus rendering any error in this regard harmless beyond a reasonable doubt. (*People v. Cobbins* (1987), 162 Ill. App. 3d 1010, 1018, 516 N.E.2d 382, 388-89.) Moreover, unlike *Smith*, the State's arguments to the jury did not exacerbate the alleged error. *Cf. Smith*, 141 Ill. 2d at 60-61, 565 N.E.2d at 908-09 (gang-related motive was argued extensively and was basic theme of the argument).

For all of the aforementioned reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

MANNING, P.J., and BUCKLEY, J., concur.