2020 IL App (1st) 172186-U
No. 1-17-2186
Order filed January 21, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | No. 14 CR 15256 |
| v. | ) | |
| | ) | Honorable Alfredo Maldonado, |
| ERICK BUSTOS, | ) | Judge presiding. |
| | ) | |
| Defendant-Appellant. | ) | |

PRESIDING JUSTICE GRIFFIN delivered the judgment of the court.
Justices Pierce and Walker concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's conviction for attempted first degree murder is affirmed over his challenge to the reliability of his identification by an eyewitness and his contention that his conviction should be reduced to aggravated battery with a firearm because he lacked intent to kill.

¶ 2   Following a jury trial, defendant Erick Bustos was found guilty of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2014)) and aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2014)). The trial court merged the counts and imposed a term of 6 years in prison for attempted first degree murder and a mandatory 25-year firearm enhancement, for a total sentence of 31 years' imprisonment. On appeal, defendant challenges the sufficiency of

the evidence, arguing that the State failed to prove his identity as the shooter where a surveillance video contradicted the testimony of the only eyewitness who identified him. In the alternative, defendant contends that his conviction should be reduced to the merged offense of aggravated battery with a firearm because the State failed to prove he acted with the intent to kill. For the reasons that follow, we affirm.

¶ 3   Defendant's conviction arose from the shooting of Anthony Muniz outside a Chicago bar in the early morning hours of August 16, 2014. Following his arrest, defendant was charged by information with six counts of attempted first degree murder and one count of aggravated battery with a firearm. Prior to trial, the State nol-prossed five of the counts of attempted first degree murder. The State proceeded to trial on one count of attempted first degree murder and the one count of aggravated battery with a firearm.

¶ 4   At trial, Muniz testified that around midnight on the night in question, he went to a bar located near the corner of Grand and Ashland Avenues with his cousin, Julius Amar, his cousin's wife, Rosalie Figueroa, and a friend, Marcelino Ferrer. Around 3 a.m., Muniz, Amar, Figueroa, and Ferrer left the bar and started walking toward Figueroa's car, which was parked on Ashland Avenue. An African-American teenager whom Muniz did not know came up to the group and "start[ed] gang-banging." Muniz estimated the teen was 15 to 17 years old, and explained that he was saying things like, "What's up mother f*****? I'm an S.D., what you all is?" Muniz told the teen that he and his friends did not "gang-bang," but the teen kept talking. The teen started walking backwards, telling Muniz and his friends to follow him, and then broke into a run. Muniz stopped walking in the street near the middle of the intersection and watched as the teen ran toward the sidewalk.

¶ 5    At this point, Muniz saw a man come out from a gangway or lot and walk to the middle of Grand Avenue. Muniz estimated the man was 75 to 100 feet from him. The man, who was facing Muniz, was wearing a hoodie, so Muniz could not see his face. Muniz testified that the man "pull[ed] up" and fired a shot. Muniz felt his body "blast backwards." Although the left side of his body felt numb and he could not lift his left arm, Muniz got up and started running down Ashland Avenue, telling his cousin and friends that he had been shot. His friends told him he had a "huge hole" in his neck.

¶ 6    An ambulance arrived and took Muniz to the hospital, where he received treatment for a wound in his neck. While he was in the hospital, Muniz spoke with the police and identified the teen in a photo array. About five months later, Muniz had surgery to remove a bullet from his shoulder. The bullet had broken his shoulder blade. Muniz displayed the scar on his neck to the jury and indicated that he had a second scar on his left shoulder.

¶ 7    On cross-examination, Muniz agreed that when he left the bar, there were more than ten people outside. When asked whether he could not identify the shooter because the shooter was too far away, Muniz answered, "Maybe because it happened so fast, you know. I'm pretty sure, say if you were standing where I said the shooter was at and I'm looking at you right now, I probably would be able to identify you. But as it happened so fast, he had the hoodie on, and as soon as he pulled up out the gun and pulled it up and shot, it just happened too fast, so I wasn't able to get a face or anything, you know, with that hoodie on."

¶ 8    David Ernst, a paramedic, testified that he responded to the scene in an advanced life support ambulance. When he arrived, he saw a person on the ground with a shirt tied around his neck. The victim had an entrance gunshot wound on his neck, just to the left of the trachea. There

was no exit wound. Ernst described the wound as "critical" because "your trachea is right there. There's numerous veins and arteries right there. Your spinal cord is in the back of the neck." Ernst and the other paramedics applied bandages, put a cervical collar around the victim's neck, started an IV, and took the victim to the hospital.

¶ 9      Rosalie Figueroa testified that when she, her husband, and Muniz left the bar about 2:45 a.m., there were a couple of people "lingering" around. In particular, she noticed a young African-American man sitting on a fire hydrant on the corner. He was "antagonizing" patrons as they were coming out of the bar by making comments and "trying to start trouble." While Figueroa was walking across Grand Avenue toward her parked car, she heard gunfire. She turned around toward the sound and saw Muniz running in her direction, holding his neck. When he got closer, she saw that he was bleeding. Figueroa called 911.

¶ 10     At some point, Figueroa went to the hospital to visit Muniz. While she was there, she spoke with a detective and, from a photo array, identified the man who had been sitting on the fire hydrant.

¶ 11     William Janson, a retired Chicago police officer with 31 years of experience, testified that on the night in question, he was working as an armed security guard for the bar. He recalled that between 2 and 3 a.m., a male African-American teenager had been around "maybe three times" trying to elicit conflicts with bar patrons on the sidewalk outside the bar on Grand Avenue. Janson had told the teen, who was wearing a gray sweatshirt with some writing on the front, to leave, but he kept coming back.

¶ 12     Close to 3 a.m., the teen returned to the area of the bar and tried to engage in conflict with customers on their way out of the bar. Janson closed the bar's door to stop more people from

coming outside, told his fellow security guards he would "take care of this," and told the teen to leave. The teen started walking westbound on Grand Avenue, still arguing with patrons who were crossing the street. Janson told the patrons not to follow the teen, who had begun to jog. Janson then started following the teen himself by walking westbound on the sidewalk of Grand Avenue.

¶ 13    Janson saw the teen turn off Grand Avenue into an empty lot. Then, a man walked out of that same lot, which was about 100 feet from where Janson was on the sidewalk. The man started walking eastbound on Grand Avenue, toward the bar. Janson described the man as white and Hispanic, and said he was wearing dark pants and a dark hoodie. The man's hood was up, but nothing was obstructing the man's face. In court, Janson identified defendant as this man.

¶ 14    Janson and defendant kept walking toward each other, with Janson on the sidewalk and defendant in the middle of the street. According to Janson, the lighting was "excellent" and nothing obstructed his view of defendant. Although there were cars parked in the street, Janson could see over them. When Janson and defendant were "maybe about two car widths apart, so maybe about 15 feet [apart]," Janson saw defendant "raise a weapon, and fire it once." Janson stopped walking, drew his own gun, pointed it at defendant, and said, "Drop the weapon." Defendant then looked at Janson and made eye contact with him. Defendant put his weapon down to his side, turned, and fled westbound on Grand Avenue.

¶ 15    Janson followed defendant through the vacant lot. As he did so, he called the police, described what he had seen, and reported defendant's direction of flight. When the police arrived, Janson helped an officer search the nearby alley, but they did not find defendant. At some point, police officers brought Janson to a different location, 613 North Paulina Street. There, he saw

defendant and the teen sitting on the sidewalk. Janson identified defendant as the shooter and the teen as the person who had "tried to instigate a conflict" outside the bar.

¶ 16    During Janson's testimony, the State showed the jury surveillance video taken from a tattoo parlor located near the bar, depicting Grand Avenue and the sidewalk on the north side of the street. The parties stipulated that the video captured the events surrounding the shooting as they occurred on August 16, 2014, and was properly recorded, even though the time and date stamp on the video was inaccurate. On the video, Janson identified himself and the teen. Janson also agreed that the video depicted a man firing a weapon, and that the shooter on the video was the same person he had identified in court.

¶ 17    The video depicts a man wearing dark pants, light shoes, and a white top with a wide grayish stripe across the chest, running westbound on the sidewalk from 5:15:53 to 5:15:57. In court, Janson stated that this man was the teen who had been trying to cause a disturbance at the bar. Shortly thereafter, at 5:16:37, a different man, wearing dark pants, dark shoes, and a dark hoodie with the hood up, enters the video from the west, running eastbound in the middle of the street. At 5:16:40 this man stops in the street, raises his arm, fires a gun toward the east, and then backs away. He is off the screen by 5:16:42. At 5:16:49, Janson enters the video from the east and jogs westbound on the sidewalk, holding a gun and a cell phone, until he runs off-screen at 5:16:56.

¶ 18    On cross-examination, Janson stated that he "was just out of the camera view" at the moment of the shooting. Janson testified that following the shooting, he lost sight of defendant after defendant went through the vacant lot. He also stated that when he went to 613 North Paulina Street, defendant and the teen were not handcuffed and were not "surrounded" by the police, although uniformed police officers were about six feet from defendant and the teen.

¶ 19    Chicago police officer Michael Howe testified that on the night in question, he and his partner responded to a call of a man with a gun and a person shot. As they approached the given address in their car, they came upon Janson, who was running down Grand Avenue holding a gun and a cell phone. Howe and his partner pulled up in front of Janson, who said, "[T]hey went that way, they went that way, it's a male Hispanic and a male black." Janson also related that the Hispanic man was wearing a black hoodie or black jacket, and the black man was wearing a "gray, white" t-shirt. Howe, his partner, and Janson then engaged in a systematic search of the area on foot, with Howe's partner and Janson going eastward through a courtyard and Howe going northward and then eastward, in and out of yards.

¶ 20    After about 15 minutes, Howe spotted two men walking together near Paulina Street: a Hispanic man wearing a black hoodie and a black man wearing a t-shirt. Howe detained the two men without handcuffing them and called for backup. Howe's partner arrived with Janson. Janson then identified both men, saying, "[T]hat's them, that's them." In court, Howe indicated that the black man was named Demarcius Lamb and identified the Hispanic man as defendant. Lamb and defendant were placed under arrest.

¶ 21    On cross-examination, Howe stated that he searched defendant's person but did not find a weapon on him. He also searched the area but did not find a gun. Howe also agreed that when he handcuffed defendant, he put his hands on defendant's hands. On re-direct, Howe stated that he had not fired his own gun at any time that day.

¶ 22    Chicago police detective Peter Maderer testified that at the police station, he administered gunshot residue (GSR) collection kits on defendant's and Lamb's hands. Scott Rochowicz, a forensic scientist who analyzed the GSR kits collected from defendant and Lamb, testified that

both defendant and Lamb tested positive for GSR. He explained that GSR is deposited on any person or object within the environment of a discharged firearm. He further explained that a positive test indicates a tested person discharged a firearm, was in close proximity to a discharged firearm, or had contacted a GSR-related item, but that it could not be determined from a positive GSR test whether the test subject fired a gun. On cross-examination, Rochowicz agreed that GSR particles could be passed from one person or object to another. Also, Rochowicz was aware of tests that showed GSR has been found in the back seats of police cars.

¶ 23    Defendant made a motion for a directed verdict, which the trial court denied.

¶ 24    Chicago police officer Ramon Ascencio testified that he spoke with Janson at the scene of the shooting. Janson related what he had seen. Ascencio did not recall whether Janson reported that he had followed a black man westbound on Grand Avenue. However, he stated that Janson may have made such a statement.

¶ 25    Eroica Del Real testified that on the night in question, she went to the bar with a group of eight or nine people that included Muniz and Figueroa, although she only knew their first names. Del Real stated that Muniz was her friend's cousin, and Figueroa was her neighbor, friend, and former classmate. When Del Real and about four other people left the bar and were waiting for the valet to bring their car around, an African-American teen approached and tried to "start trouble." He then ran towards Ashland Avenue. A minute or two later the teen came out of "a gangway or like a parking lot or something towards the opposite of Ashland" holding a gun. At that point, Muniz and the rest of Del Real's "crowd" came out of the bar. Muniz tried to approach the teen. Del Real told him not to do so, because the teen had a gun, but the teen "got off some shots" and

Muniz was hit. Del Real specified that she saw sparks from the gun and then saw blood coming from the upper part of Muniz's body.

¶ 26    On cross-examination, Del Real specified that the teen fired directly at Muniz, not at the crowd generally. She estimated that the teen was about 20 feet from Muniz when he fired the gun. Del Real acknowledged that she did not talk to the police at the scene and did not go to the police department to relate what she had witnessed. She explained that she did not do so because she was under the impression that the shooter was in prison or jail. It was not until a few months before trial that she leaned from defendant's mother, who was "a friend of a friend of a friend," that defendant was in custody for the shooting.

¶ 27    Muniz testified in rebuttal that he did not know Del Real and that she was not at the bar with him and his friends on the night of the shooting. He agreed that a black man was bothering him and his friends that night and then ran away. Muniz never saw a gun in the black man's hand and did not see the black man fire a gun at him from 20 feet away. It was a different individual who fired the gunshot.

¶ 28    During closing argument, defense counsel, among other things, urged the jury to look at the surveillance video and compare it to Janson's testimony. Counsel pointed out a parked "van of some sort" in the video and then made the following statements:

> "He's coming from up that way. And try to see past that car. That's not credible. Watch. Let's wait for him to turn his head and look at the shooter. Never happens. You will get the video. You can watch it in the room. Watch it again, see if you can see that person's head turn towards Mr. Janson. You can watch it a hundred times. It won't. Directly

contradicts his testimony on the stand, that he can get a good look at that person's face and match eye to eye.

\*\*\*

You guys get to judge his credibility. We would argue that video directly contradicts it. You can see the cars. You can see the view. The short amount of time, the hooded sweatshirt. It goes towards his ability to identify that shooter."

¶ 29    Following deliberations, the jury found defendant guilty of attempted first degree murder and aggravated battery with a firearm.

¶ 30    The trial court denied defendant's amended motion for a new trial. At sentencing, the trial court merged the counts and imposed a term of 6 years in prison for attempted first degree murder and a mandatory 25-year firearm enhancement, for a total sentence of 31 years' imprisonment.

¶ 31    On appeal, defendant first challenges the sufficiency of the evidence. He argues that the State failed to prove his identity as the shooter where the surveillance video contradicted Janson, the only eyewitness who identified him. Defendant asserts that Janson's identification of him was unreliable because Janson had a limited opportunity to view the shooter. Defendant acknowledges that Janson testified he was only 15 feet from the shooter and close enough to look him in the eye, but maintains that the video contradicts this testimony. Noting that it took nearly 10 seconds after the shooter ran away for Janson to be seen on the video jogging into the camera's view, defendant argues that this circumstance "indicates that Janson was further away from the scene of the shooting." He asserts that if Janson indeed was just out of the camera's view and only 15 feet from the shooter at the moment of the shooting, it is unbelievable that it took him nearly 10 seconds to jog into the surveillance camera's view, and that Janson's action of drawing his weapon and calling

the police cannot explain the delay. Defendant further argues that Janson's degree of attention would have been curtailed by the suddenness with which the gunshot rang out and the high number of people and activity in the area; that Janson's description of a white Hispanic man in a hoodie was generic and vague; that Janson's level of certainty does not correlate with accuracy; that the show-up identification was suggestive by its nature; and that the positive result of the GSR test does not establish defendant fired a gun.

¶ 32     When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). The testimony of a single witness, if positive and credible, is sufficient to convict. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 33     To assess identification testimony, this court applies the factors set out by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). *People v. Branch*, 2018 IL App (1st) 150026, ¶ 25. Those factors are: (1) the opportunity that the witness had to view the offender at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the offender; (4) the level of certainty demonstrated by the witness at the identification; and (5) the length of time between the crime and the identification. *Id.*

¶ 34     We find that the majority of the *Biggers* factors favor the State in this case.

¶ 35     First, Janson had sufficient opportunity to observe the shooter. Janson testified that he and defendant walked toward each other on Grand Avenue, where the lighting was excellent. Defendant had nothing covering his face, and the parked cars did not obstruct Janson's view. As defendant acknowledges, Janson stated that he and defendant were only about 15 feet apart when defendant raised his weapon and fired a shot, after which Janson told defendant to drop the gun. The two men then made eye contact before defendant turned and fled. While the encounter Janson described may have been brief, the brevity of a witness's observation does not undermine his identification testimony. *People v. Barnes*, 364 Ill. App. 3d 888, 894 (2006).

We are not persuaded by defendant's argument that the video contradicts Janson with regard to his opportunity to observe the shooter. Defendant is correct that almost 10 seconds elapse on the video between the moment of the shooting and Janson's appearance on the screen. However, Janson never said that he started to pursue defendant immediately upon the shot being fired. Rather, Janson said that he stopped walking, drew his own gun, pointed it at defendant, and said, "Drop the weapon." Defendant put his arm down, turned, and fled, at which time Janson followed him while calling the police. Given that Janson and defendant took all these actions, and that Janson did not specify how quickly he moved upon beginning his pursuit, we cannot find that the video contradicts Janson's 15-foot estimate or shows Janson lacked a sufficient opportunity to observe the shooter. In closing arguments, defense counsel specifically argued that the video contradicted Janson's testimony. The jury apparently rejected that argument, and we decline to substitute our judgment for the jury's on this issue of witness credibility. See *Brooks*, 187 Ill. 2d at 131.

¶ 36　As to the second factor, we disagree with defendant's assertion that Janson's degree of attention would have been curtailed by the suddenness with which the gunshot rang out and the high number of people and activity in the area. This was not a situation where the witness's attention may have been elsewhere until the instant the crime was committed. Rather, Janson had walked away from the crowd outside the bar when he started following the teen on Grand Avenue. He was paying attention to the teen, who turned off Grand Avenue into an empty lot, and saw defendant walking out of that same lot. Janson and defendant then walked toward each other until they were about 15 feet apart. These circumstances demonstrate that Janson's attention was focused, rather than distracted. Moreover, Janson gave a detailed description of what he saw during his brief encounter with defendant, which indicates a high degree of attention to the incident. See *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 33.

¶ 37　Third, Janson's prior description of the offender as a Hispanic man wearing a black jacket or hoodie accurately matched defendant's appearance when Janson identified him at the show-up. While defendant may be correct that Janson's prior description was "vague" and "generic," we cannot say that it was inaccurate. Our supreme court has held that a general description of an offender may nevertheless be found sufficient. *Slim*, 127 Ill. 2d at 309.

¶ 38　The fourth *Biggers* factor is the level of certainty demonstrated by the witness at the identification. Janson never said how confident or certain he was in his identification, but, on the other hand, he also never wavered in his identification. In these circumstances, we find that the fourth factor is neutral. We are mindful of defendant's position that this factor should be given little weight because psychological research indicates that a witness's level of certainty is equally strong whether or not the identification is correct. However, defendant did not present expert

testimony at trial to support his argument that the correlation is weak in this case. This court has found this same argument unpersuasive where no evidence was presented at trial to support a finding that the witness's certainty should be given little weight. See *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 56.

¶ 39     Fifth, the parties agree that about 30 minutes passed between the shooting and Janson's identification of defendant. Defendant concedes that this is a relatively short time period, and we find that the timing factor thus weighs in favor of the State. Nevertheless, defendant asserts that "[w]hile 30 minutes is a relatively short time period, it should be noted that the identification was done via a show-up where [defendant] was detained by other police units and presented to Janson for the purpose of identifying him as the offender." Defendant argues that show-ups are suggestive by nature, and that therefore, the timing factor does not support the reliability of Janson's identification.

¶ 40     Our supreme court has held that prompt show-ups near the scene of a crime are acceptable police procedure, as they are designed to aid the police in determining whether to continue or to end the search for culprits. *People v. Lippert*, 89 Ill. 2d 171, 188 (1982). Also, show-ups are not unduly suggestive just because defendants are in police custody when they are conducted. *People v. Jones*, 2017 IL App (1st) 143766, ¶ 30. Rather, show-ups implicate the due process clause only when they are so unnecessarily or impermissibly suggestive that there exists " 'a very substantial likelihood of irreparable misidentification.' " *Id.* ¶ 27 (quoting *People v. Moore*, 266 Ill. App. 3d 791, 796-97 (1994)).

¶ 41     Here, the record indicates that the police had ample reason to conduct a show-up rather than wait to assemble a photo array or a lineup. Janson witnessed a man shooting and then fleeing

through a vacant lot. Within minutes, an officer detained defendant. Janson's show-up identification allowed the police to determine that they did not need to continue to search for a culprit. Although defendant was in police custody during the show-up, this factor alone does not render the identification procedure unduly suggestive. *Id.* ¶ 30. That a show-up occurred in this case does not undermine Janson's identification.

¶ 42    Finally, we are mindful of defendant's argument that the positive result of the GSR test does not establish he fired a gun. Indeed, the State's forensic scientist testified as such at trial. However, where, as here, eyewitness testimony is sufficient to support a conviction, the State is not required to present physical evidence, such as GSR, in order to prove a defendant discharged a firearm. See *People v. Daheya*, 2013 IL App (1st) 122333, ¶¶ 75-76. In this case, the positive GSR test corroborated Janson's testimony, but was not necessary to prove defendant guilty.

¶ 43    Where the majority of the *Biggers* factors weigh in favor of the State, we do not find Janson's identification "so unsatisfactory, improbable or implausible" as to create a reasonable doubt as to defendant's guilt. *Slim*, 127 Ill. 2d at 307. Defendant's challenge to the sufficiency of the evidence fails.

¶ 44    Defendant's second contention on appeal, made in the alternative, is that his conviction for attempted first degree murder should be reduced to the merged offense of aggravated battery with a firearm because the State did not prove beyond a reasonable doubt that he acted with an intent to kill when he fired a single shot into a crowd of people from a distance of 75 to 100 feet and then ran away. He argues that the act of firing a gun at someone is merely one of several surrounding circumstances to be considered in evaluating whether an intent to kill was present. He notes that the State presented no evidence that he or Lamb made any statements regarding an intent to kill,

argues that he did not specifically aim at Muniz, and asserts that he was at a distance that would have made it very difficult to aim at one specific person.

¶ 45    Because proof of a defendant's intent to kill is rarely based on direct evidence, such intent may be implied from the character of the act. *People v. Glazier*, 2015 IL App (5th) 120401, ¶ 15. Intent to kill may be established by proof of surrounding circumstances, including the use of a deadly weapon. *Petermon*, 2014 IL App (1st) 113536, ¶ 39. Specifically, such intent may be proven where the defendant fired a gun at or towards another person with malice or with a total disregard for human life, and the very act of firing a gun at a person supports the conclusion that the shooter acted with an intent to kill. *Id.* (citing *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001).

¶ 46    We reject defendant's arguments. First, evidence of a defendant's firing a gun a single time is sufficient to support the inference of intent to kill. *People v. Stanford*, 2011 IL App (2d) 090420, ¶ 41. Second, defendant has cited no authority for his argument that shooting a gun from a distance of 75 to 100 feet makes it unlikely that he had intended to kill Muniz when he fired his gun. That defendant was less likely to be successful in hitting his target from a distance than from a close range does not alter intent. See *People v. Linton*, 243 Ill. App. 3d 389, 391, 396-97 (1993) (finding intent to kill where shots were fired from a distance of 70 to 90 feet). Third, the fact that defendant fled after the shooting is not dispositive, as once the elements of attempted murder are complete, abandonment of the criminal purpose is no defense. *People v. Myers*, 85 Ill. 2d 281, 290 (1981); see also *People v. Parker*, 311 Ill. App. 3d 80, 90 (1999) (abandonment is not a defense to criminal attempt). Finally, while it is true defendant did not confess to intending to kill Muniz, the State

need not prove a defendant's intent to kill by direct evidence. *People v. Glazier*, 2015 IL App (5th) 120401, ¶ 14.

¶ 47    Viewing the evidence in the light most favorable to the prosecution, as we must, we find that a rational trier of fact could have found the element of intent to kill beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. at 318-19. The jury heard evidence that Lamb approached Muniz outside the bar, badgered him with gang-related talk, and goaded him to follow in the direction of the vacant lot. As soon as Lamb turned in to the lot, defendant came out of that same lot, walked to the middle of the street, raised a weapon, and fired, hitting Muniz in the neck. Janson ordered defendant to drop the weapon, at which point defendant looked at Janson, lowered his arm, and ran from the scene, back through the vacant lot. Less than half an hour later, the police came upon defendant and Lamb walking together, not far from the scene of the shooting.

¶ 48    The evidence presented to the jury, taken in the light most favorable to the State, supports an inference that defendant and Lamb were acting in concert and specifically targeted Muniz. Moreover, as noted by the State in closing arguments, the evidence also supports an inference that while defendant fired only a single shot, he may have stopped shooting only because Janson interrupted him. Finally, although neither Muniz nor Janson testified that defendant aimed specifically at Muniz when he fired toward the people outside the bar, it is clear that defendant did not shoot into the air, like a warning shot, or at the ground, as if to merely intimidate. We conclude that the jury could have reasonably found that, based on all the circumstances of the shooting, defendant acted with the intent to kill Muniz. Accordingly, defendant's contention that his conviction should be reduced from attempted first degree murder to aggravated battery with a firearm fails.

¶ 49    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 50    Affirmed.