2022 IL App (1st) 201012-U

No. 1-20-1012

Filed March 17, 2022

Fourth Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except for the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* COMMITMENT OF KEVONTAE STEEN | ) ) | Appeal from the Circuit Court of Cook County. |
| (The People of the State of Illinois, Petitioner-Appellee, | ) ) ) | |
| | ) | No. 13 CR 80002 |
| v. | ) ) | The Honorable |
| Kevontae Steen, Respondent-Appellant). | ) ) | Peggy Chiampas, Judge Presiding. |

Justice MARTIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1     *Held*: The State presented sufficient evidence for the circuit court to find that the Respondent was substantially likely to reoffend and was, therefore, subject to commitment as a sexually violent person.

¶ 2     After a bench trial, Kevontae Steen was found to be a sexually violent person (SVP) pursuant to the Sexually Violent Persons Commitment Act (SVP Act) (725 ILCS 207/1 *et seq*.) (West 2018). The circuit court committed Steen to the Department of Human Services (DHS). In this appeal, Steen challenges the sufficiency of the evidence finding that he is an SVP.

¶ 3                                    I. BACKGROUND

¶ 4        Steen was adjudicated delinquent of aggravated criminal sexual abuse for an offense that occurred in 2005 when he was 12 years old. Steen and three friends were walking down a street when Steen noticed a 5-year-old girl playing in her backyard. Steen removed a stick holding a gate shut and lured the girl into an alley by offering her a dollar to follow him. Despite his friends urging him not to, Steen lowered his pants, pulled the girl toward him, and forcibly held her head while he placed his penis in her mouth. The girl ran to her house and told her mother what happened. Steen was arrested after one of his friends told their school principal about the incident.

¶ 5        Following his delinquency adjudication, the court sentenced Steen to a five-year term of probation. Less than a month later, Steen was arrested for drug possession and was held in juvenile detention. He was transferred to a residential treatment center for adolescent sex offenders where he spent 18 months. While there, Steen made minimal progress in treatment, assaulted other detainees and staff, and committed other infractions involving property theft or damage. A mental health evaluator noted that Steen sexualized female staff and found that Steen had a more intense sexual lifestyle than others of the same age.

¶ 6        After Steen committed two aggravated batteries in 2008, Steen's probation was revoked, and he was sentenced to the Illinois Department of Juvenile Justice (IDJJ) for a term of seven years or until he reached the age of 21. He was transferred to an IDJJ youth facility in St. Charles, Illinois. A mental health assessment recommended Steen participate in a treatment program for juvenile sex offenders, as well as programs for anger management and substance abuse. He was then placed in another youth facility in Kewanee, Illinois where the recommended programs were available. After nine months in the Kewanee facility, Steen's participation in the sex offender treatment program was minimal, only reaching the second chapter of a workbook. Steen also continued to

get into fights, assault staff, and engage in sexual misconduct, namely exposing himself and masturbating toward female staff. In some instances of sexual misconduct, Steen added verbal threats of violence toward the target. IDJJ determined Steen could not be managed at the Kewanee facility following an assault on another detainee, so he was transferred to a maximum security youth facility in Joliet, Illinois. Steen continued to violate facility rules, and he received numerous disciplinary tickets.

¶ 7        In the Joliet facility, Steen attended treatment groups but minimally participated. About two years later, Steen was denied juvenile parole and returned to the Kewanee facility to undergo sex offender treatment. His participation remained minimal, and he made little progress. In March 2013, Steen was transferred to a Treatment and Detention Facility (TDF) of the DHS based upon the State's petition that Steen be committed under the SVP Act. In the TDF, Steen continued to expose himself and masturbate toward female staff.

¶ 8        At trial, the State presented the testimony of two experts who had evaluated Steen through interviews and review of records pertaining both to his criminal cases and detention. Clinical Psychologist Dr. Deborah Nicolai testified that she diagnosed Steen with (1) other specified paraphilic disorder, sexually attracted to non-consenting females and (2) antisocial personality disorder. She explained that paraphilia is an intense, persistent sexual interest apart from genital stimulation or preparatory fondling with a phenotypically normal, physically mature consenting partner. A paraphilic disorder means paraphilia causes distress or impairment to the individual or its satisfaction entails personal harm or risk of harm to others. Dr. Nicolai's diagnosis of Steen was "other specified" since attraction to non-consenting females does not meet the full criteria for any of the specified categories of paraphilic disorder contained in the Diagnostic Manual of Mental Disorders, 5th Edition (DSM-5).

¶ 9        Dr. Nicolai testified that her paraphilic disorder diagnosis of Steen was based on the sexual assault of the 5-year-old girl when he was age 12, his 35 documented instances of sexual misconduct while in custody, many involving verbalized threats of force, and the results of a sexual fantasy inventory questionnaire in which Steen admitted to regularly fantasizing about forcing someone to do something.

¶ 10       Dr. Nicolai further testified that antisocial personality disorder is a pervasive pattern with disregard for, and in violation of, the rights of others occurring since age 15. Steen, she said, exhibited at least three of seven facets of the disorder. Steen committed numerous acts that would be grounds for arrest, including fire setting, theft, vandalism, and robbery, both while he was in and out of custody. He was arrested 21 times between 2001 and 2006. Prior mental health professionals consistently described Steen as deceitful and manipulative. These behaviors evinced a failure to conform to the norms of society. Steen's repeated assaults also indicated aggressiveness. Additionally, Steen was cruel to animals, having beaten a bird, dog, and cat to death. Dr. Nicolai testified that Steen's antisocial personality disorder exacerbates his paraphilic disorder as he is impulsive, lacks remorse, and does not respect rules or laws. For those reasons, she believed Steen has an increased likelihood to commit further sexual offenses.

¶ 11       Although Steen had not physically touched a victim since he was age 12,[1] Dr. Nicolai stated a paraphilic disorder diagnosis was proper since it is chronic. She explained that the disorder does not go away, and Steen continued to display behaviors consistent with the disorder over time while in custody. Specifically, Steen exposed himself and masturbated toward female staff, knowing that his behavior was unwanted. Dr. Nicolai testified that the condition predisposes Steen to commit acts of sexual violence, but she explained that it can be managed with treatment.

_____

[1] Steen was 25 years of age at the time of trial.

¶ 12     To determine Steen's likelihood of committing a future sexually violent offense, Dr. Nicolai used an actuarial instrument derived from empirical data associated with sexual offense recidivism known as Static-99 Revised (Static-99R). Dr. Nicolai testified that Static-99R is the most researched and widely used actuarial tool to assess recidivism for male sex offenders. Her assessment of Steen resulted in a score of six, which Dr. Nicolai asserted is well above average for likelihood of committing another sexual offense and in the highest risk category under Static-99R. She further explained Steen's score is associated with a 94.2 percentile rank, meaning 94.2% of other subjects scored lower than Steen, 3.6% scored about the same, and only 4% scored higher.

¶ 13     Dr. Nicolai stated that she had reservations about using Static-99R to assess Steen since the research underlying Static-99R was not addressed toward juvenile offenders. She explained that there remains a theoretical question as to the similarity between juvenile and adult sex offenders. Dr. Nicolai acknowledged that the rate of juvenile sex offender recidivism is lower than that of adult sex offenders. Yet, Dr. Nicolai qualified that there is only a disparity when the juvenile's offense is "juvenile in nature." Though Steen committed his offense at age 12, Dr. Nicolai testified the offense was atypical for juvenile sex offenders. Specifically, only 2% of juvenile sex offenders victimize a stranger as Steen did. Additionally, Steen committed the offense in the middle of the day, he moved the victim from one place to another, and he used force—all uncommon for juvenile sex offenders. For those reasons, Dr. Nicolai opined that Steen is different from other juvenile sex offenders.

¶ 14     In addition to the Static-99R score, Dr. Nicolai considered other factors to reach her opinion that Steen posed an above average risk of reoffending. Dr. Nicolai identified several "dynamic risk factors" that Steen exhibited, which empirical studies have shown to be associated with an increased risk of recidivism among sexual offenders. These included (1) sexual

preoccupation, (2) an attitude that justifies sexual offenses, (3) a lack of intimate relationships with adults, (4) antisocial personality disorder, (5) general impulsivity, and (6) poor cognitive problem solving. Dr. Nicolai stated that dynamic factors such as these can change or be managed, but the factors indicate an increased risk that Steen would reoffend if released since he would lack supervision, would not be required to undergo treatment, and is unlikely to seek treatment voluntarily. Further, Steen lacked any "protective factors" associated with a decreased risk of reoffence, such as completion of a treatment program, medical impediment, or advanced age. Ultimately, Dr. Nicolai opined that it is substantially probable—much more likely than not—that Steen will engage in acts of sexual violence.

¶ 15    The State's second expert was Clinical Psychologist Dr. Richard Travis who similarly evaluated Steen through interviews and review of records. Dr. Travis diagnosed Steen, according to the DSM-5, with (1) other specified paraphilic disorder, hypersexuality with impaired impulse control, heterosexually focused, (2) exhibitionistic disorder, sexually aroused by exposing himself to females, and (3) antisocial personality disorder.

¶ 16    Dr. Travis cited Steen's self-reported number of 30 sexual partners by age 19 and his repeated exposure and sexual remarks directed toward female staff as bases to specify Steen's paraphilic disorder diagnosis as hypersexuality. Steen's hypersexuality was a disorder, according to Dr. Travis, because Steen—continually from his aggravated sexual abuse in 2005 through his misconduct in various detention facilities in 2017—acted toward nonconsenting people and caused them harm. Dr. Travis commented that impaired impulse control was a defining characteristic of Steen's personality, as evinced by his hospitalization at age four for aggression and his persistent behavior throughout his detention.

¶ 17   Exhibitionist disorder, Dr. Travis testified, is a more specifically labelled disorder in the DSM-5 but is subsumed, in his diagnosis, under the more general paraphilic disorder of hypersexuality with impaired impulse control. Dr. Travis cited Steen's 38 documented instances of exposing himself as the basis for this diagnosis.

¶ 18   As for antisocial personality disorder, Dr. Travis testified that Steen met all the criteria for the diagnosis. Specifically, Dr. Travis cited Steen's continuous violation of rules, disregard for the safety of others, deceitfulness, impulsivity, irresponsibility, hostility, and lack of remorse. Dr. Travis noted that Steen told him in a 2013 interview that he knows exposing himself to females insults and violates them. Yet, Steen continued that behavior numerous times over the following years. Taken together, Dr. Travis opined, Steen's disorders affect his volitional capacity—meaning that he is disinhibited from acting on his urges. In Dr. Travis's opinion, Steen is predisposed to commit future acts of sexual violence.

¶ 19   Like Dr. Nicolai, Dr. Travis also used Static-99R to assess Steen's risk of re-offending. Dr. Travis stated that it is advised to not use Static-99R to evaluate a person who only committed a sexual offense before age 16. Static-99R was applicable to assess Steen, however, since Static-99R included individuals like Steen in the population studied to derive the actuarial values. That is, Static-99R included individuals who committed sexual offenses before age 16 and later committed sexual misconduct in a detention facility without touching a victim.

¶ 20   Applying Static-99R, Dr. Travis scored Steen at an eight. The score was based on Steen being under age 35, never having lived with an intimate partner for two years, having a prior conviction for non-sexual violence, having a conviction for a sex offense, having four or more total convictions, committing a sexual offense without physical contact, committing an offense against a stranger, and committing offenses against unrelated victims. Dr. Travis testified that the

median Static-99R score is two and Steen's score of eight means he is 7.3 times more likely to reoffend than the median sex offender. Steen's score is higher than 98.5% of sex offenders scored using Static-99R. Just as Dr. Nicolai testified, Dr. Travis stated that Steen is in the highest risk category.

¶ 21    In addition to Static-99R, Dr. Travis evaluated Steen using Stable 2007, a tool based on meta-analyses that includes 13 dynamic risk factors. The average score for Stable 2007 is 7.06. Dr. Travis scored Steen at 24, well into the highest risk category.

¶ 22    Apart from Static-99R and Stable 2007, Dr. Travis testified that Steen exhibited factors that research supports as associated with an increased risk of re-offense: (1) antisocial personality disorder, (2) separation from parents as a child, (3) childhood behavioral problems, (4) childhood criminality, (5) pro-criminal attitudes, and (6) violation of probation. Dr. Travis also considered factors associated with a decreased risk of re-offense—completion of a treatment program, disabling health condition, and age over 35—but Steen lacked these factors. As for treatment, Dr. Travis stated Steen has only reached the start of the second of five phases in the program and is far from working on relapse prevention. Dr. Travis noted that Steen had shown some recent improvement with treatment, but that he quit participating in February 2018. Ultimately, Dr. Travis opined that it was substantially probable Steen would commit a future act of sexual violence.

¶ 23    In his case, Steen elicited the testimony of Clinical Psychologist Dr. Lesley Kane who had also interviewed Steen and reviewed records related to his criminal history, medical and psychiatric history, and disciplinary history from his time in custody. Dr. Kane testified that Steen's mother was addicted to cocaine, and he was likely born with drugs in his system. His mother had eight children, each with a different father. Steen's father was a heroin addict reputed to be imprisoned for murder. His mother's neglect and drug use led the Department of Children

and Family Services to place Steen and siblings with his grandmother. Steen had a close relationship with his grandmother, though she was strict. As was his uncle who sometimes cared for Steen and his siblings and employed corporal punishment. Steen's grandmother passed away around 2007. Steen had little contact with his mother during his childhood. After moving to Minnesota and getting sober in 2012, Steen's mother began having regular phone calls with him and they had grown closer.

¶ 24       Steen had a history of aggression and often got into fights, starting at an early age. Steen was hospitalized several times as a child due to his aggression. As a juvenile, he was diagnosed with several disorders, including attention deficit hyperactivity disorder (ADHD), oppositional defiance disorder, conduct disorder, impulse control disorder, and bipolar disorder. At various times, he was placed on medications to address his ADHD and stabilize his mood. When Dr. Kane interviewed him in 2017, Steen was not prescribed any medications to address those conditions. Steen reported to Dr. Kane that he had occasional thoughts of suicide and had threatened suicide several times while in IDJJ custody, but he admitted he did so to manipulate IDJJ to change his housing arrangements.

¶ 25       According to Dr. Kane, Steen reported that his first sexual experience occurred at age 11 with three 13-year-old girls who performed oral sex on him in a school yard playground. He also stated that he had 30 to 35 sexual partners, many older than him.

¶ 26       At the time of her testimony, Dr. Kane had diagnosed Steen with cannabis use disorder in a controlled environment, opioid use disorder in a controlled environment, and antisocial personality disorder in accordance with the DSM-5. However, she testified that he was participating in treatment and showed improvement. He had become less impulsive, more communicative, and acknowledged the inappropriateness of his offense. Steen had been taking

part in several group activities including exercise, poetry, music, and a book club. Steen completed high school and stated he aspired to obtain an associate's degree and become a mechanic.

¶ 27　　Like Drs. Nicolai and Travis, Dr. Kane used the Static-99R to assess Steen. She derived a score of seven, which is greater than average for likelihood to commit another sex offense. Also, like Drs. Nicolai and Travis, Dr. Kane had reservations about using Static-99R for Steen since his offense occurred at age 12. Dr. Kane explained that Static-99R should generally not be used for juvenile offenders unless they committed an "adult-type offense." She further explained that Static-99R may be used to assess a juvenile offender when he commits an act of sexual misconduct while in custody as an adult and such act would constitute a criminal offense if the act had occurred outside of custody. Thus, Dr. Kane found Static-99R applicable for Steen since he had exposed himself while in custody as an adult.

¶ 28　　Despite his high score, Dr. Kane believed Static-99R "inflated" Steen's risk of reoffending. In her opinion, Steen did not pose such a great risk because his offense of conviction was committed at a very young age, and, in that offense, he mimicked behavior he had observed—men paying females to perform oral sex. Due to those considerations, Dr. Kane thought Static-99R's factors were unfair bases to predict Steen's likelihood to commit sexual offenses. She further noted that Static-99R does not differentiate between sexual offenses involving physical contact and sexual offenses without contact.

¶ 29　　Apart from Static-99R, Dr. Kane identified anger, substance abuse, separation from his parents before age 16, and anti-social personality disorder as dynamic factors weighing toward Steen's risk of committing another sex offense. However, Dr. Kane listed several protective factors that weighed against his risk of reoffending. Steen had shown some maturity through treatment. His anti-social mindset was decreasing. He showed some ability for empathy and to recognize

inappropriate behavior. He improved his ability to regulate emotion and communicate. And he had support from family.

¶ 30    Differing from Drs. Nicolai and Travis, Dr. Kane did not believe that Steen qualified for a paraphilia diagnosis. Rather, she attributed his exhibitionism to his institutionalization. She stated such behavior is common among inmates and they make a game of it with a point-scoring system. She noted that many inmates who are not sex offenders expose themselves and, due to their incarceration, it is the only way for them to be sexual with a female. Accordingly, Dr. Kane believed Steen's exhibitionism resulted from being held in institutions for most of his teens and early 20s, when his sex drive was at its peak, and such behavior was his only available method for sexual gratification with a female. Dr. Kane did not believe Steen would similarly expose himself if he were out of custody. Instead, she anticipated he would be sexually promiscuous with age-appropriate females and unlikely to reoffend. Based on her assessment, Dr. Kane opined that Steen did not suffer from a mental disorder that would lead him to engage in acts of sexual violence.

¶ 31    In ruling, the trial court remarked that this was a difficult and unique case since Steen's offense occurred at age 12 and he had been incarcerated for most of his life since age 14. The court summarized the testimony of the expert witnesses, noting that each expert diagnosed Steen with mental disorders. The court further noted that both Drs. Nicolai and Kane had reservations about using Static-99R to assess Steen, both consulted the researchers who developed Static-99R, and both ultimately determined Static-99R was applicable: Dr. Nicolai because Steen's offense at age 12 was "adult in nature" and Dr. Kane because Steen exposed himself as an adult while in custody. In addition, the court found that the evidence did not show "linear progression" and improvement in Steen's treatment, as his counsel had argued. Rather, the court found that, although his

participation had increased in recent years and there had been no instances of sexual misconduct since August 2017, Steen later withdrew from treatment in February 2018. The court went on to note that Drs. Nicolai and Travis considered other factors supported by research to form their opinions that Steen was substantially likely to reoffend. In contrast, the court found that Dr. Kane did not support her opinion that Static-99R was an unfair predictor that inflated Steen's risk of reoffending with further research or analysis. Instead, in the court's findings, she merely opined that Static-99R was an inappropriate measure. The court also noted that Dr. Kane nevertheless judged Static-99R applicable after consulting its developers and, like Drs. Nicolai and Travis, obtained a score that put Steen in the highest risk category. Similarly, the court found that Dr. Kane's ultimate opinion—that Steen does not suffer from a mental disorder that makes him substantially probable to commit acts of sexual violence—did not have a sufficient basis. In the court's view, that opinion relied on Dr. Kane's unsupported assessment that Steen's exhibitionism was merely institutionalized behavior. The court further remarked that it was unpersuaded by Dr. Kane's testimony since she often expressed lack of recollection and frequently couched her responses in qualifying language, such as "not sure what this means," "I think," and "I can't remember exactly." Overall, the court found the State's experts more persuasive and their opinions more credible and supported. Accordingly, the court found that the State met its burden and proved beyond a reasonable doubt that Steen is an SVP.

¶ 32    Following the court's finding that Steen was a sexually violent person under the SVP Act, the court ordered a supplemental mental examination and predisposition investigation. Dr. Travis conducted both and prepared a report for the court. In his report, Dr. Travis indicated that Steen resumed treatment and showed a greater level of accountability than before, though his level of participation in treatment was inconsistent. He had two subsequent exposure incidents, including

one involving a female therapist while in a closed room. Dr. Travis described that incident as an escalation from Steen's prior incidents, in which his victims were typically in a separate room or at a greater distance in an open space. Dr. Travis's report discussed residential and community treatment options; that is, whether Steen should remain in custody or receive treatment while residing in the community. Dr. Travis opined that Steen needed to develop and implement a relapse prevention plan in treatment before being released and the intensive treatment available in the TDF facility was the better option for Steen to obtain that treatment. Upon review of Dr. Travis's report and after hearing argument from counsel for both Steen and the State, the court found that the least restrictive placement in which Steen could be adequately, effectively, and safely managed and treated was at the TDF facility. Accordingly, the court ordered him committed to the custody of the DHS. This appeal followed.

¶ 33                                                    II. ANALYSIS

¶ 34            On appeal, Steen argues that the evidence was insufficient to prove that he is a sexually violent person under the SVP Act. To establish that a person is an SVP, the State must prove beyond a reasonable doubt that (1) the respondent was convicted or found delinquent of a sexually violent offense, (2) the respondent has a mental disorder, and (3) the mental disorder creates a "substantial probability" they will engage in acts of sexual violence. 725 ILCS 207/15(b)(1)(A-B), (b)(4), (b)(5) (West 2018). A "mental disorder," as defined by the SVP Act, is "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2018); *In re Commitment of Evans*, 2021 IL App (1st) 192293, ¶ 41. In this case, it was undisputed that Steen was found delinquent of a sexually violent offense. He claims that the State failed to prove the second and third elements— whether he has a mental disorder that makes it substantially probable that he would engage in

future acts of sexual violence. We apply a deferential standard to the trial court's findings on these factual issues. When reviewing claims challenging the sufficiency of the evidence to prove that a respondent is an SVP, we view the evidence in the light most favorable to the State, and consider whether any rational trier of fact could find that the elements were proved beyond a reasonable doubt. *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. " 'A reviewing court will not reverse a trier of fact's sexually violent person determination unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt' for '[i]t is not the role of the reviewing court to substitute its judgment for that of the trier of fact regarding the credibility of the witnesses or the weight to be given the evidence.' " *Evans*, 2021 IL App (1st) 192293, ¶ 42 (quoting *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 56).

¶ 35        All three experts, including Steen's, diagnosed him with antisocial personality disorder. The experts differed on whether Steen had a paraphilic disorder and, ultimately, whether it was substantially probable he would reoffend. Dr. Nicolai diagnosed Steen with other specified paraphilic disorder, nonconsenting females. Dr. Travis diagnosed Steen with other specified paraphilic disorder, hypersexuality with impaired impulse control and exhibitionistic disorder. Both Drs. Nicolai and Travis explained how Steen met the diagnostic criteria for these disorders. They also both testified that Steen's antisocial personality disorder and lack of impulse control disinhibit him and exacerbate the risk from his paraphilic disorders. As such, both experts concluded that Steen's disorders affect his emotional and volitional capacity and predispose him to commit acts of sexual violence. In addition, both Drs. Nicolai and Travis opined that Steen was substantially probable to engage in future acts of sexual violence. Their testimony showed that each based their opinion on the actuarial scores of the Static-99R assessment, consideration of

research-based dynamic risk factors, and accounted for the absence of protective factors, especially Steen's lack of progress in treatment.

¶ 36      Steen argues that the opinions of Drs. Nicolai and Travis were insufficient to support the court's findings. First, Steen asserts that reversal is warranted because the State's experts' opinions "heavily relied on" his disciplinary reports and such reports were the "primary basis" for their opinion that it is substantially probable that he would commit sexually violent crimes. Steen points to *People v. Smith*, 141 Ill. 2d 40 (1990), as our supreme court's caution against relying on prison disciplinary records in criminal matters. Steen acknowledges that *Smith* addressed a different issue from the one here. Indeed, *Smith* examined whether prison disciplinary records were admissible under the business records hearsay exception, whereas here, the experts only mentioned such records as part of the basis for their opinions. So, unlike *Smith*, Steen's disciplinary records were not offered as substantive evidence. See *id.* at 68. Nonetheless, Steen argues that the *Smith* decision's reasoning for concluding that prison disciplinary records are inadmissible under the business records exception should lead us to conclude that the State's experts' opinions were based on unreliable evidence. In *Smith*, the court stated that prison disciplinary records "generally lack the earmarks of trustworthiness and reliability…" *Id.* at 73. The court noted that such records are often prepared following a confrontation between prison employees and inmates "with an eye toward some form of subsequent discipline" and in contemplation of potential civil rights litigation. *Id.* Steen contends that his disciplinary records are likewise unreliable as a basis for Drs. Nicolai's and Travis's opinions since such records were prepared by employees of the custodial institutions and the experts accepted their veracity without scrutiny.

¶ 37      Reviewing the testimony of Drs. Nicolai and Travis, we disagree that consideration of Steen's disciplinary records in forming their opinions renders their opinions unreliable as to

warrant reversal. Comparison with *Smith* illustrates this point. In *Smith*, the State posited that the defendant shot and killed the victim, who was an assistant warden at an Illinois correctional center, outside of a bar, at the direction of his gang leader, in retaliation for a prior altercation between the gang leader and the assistant warden that occurred in prison. *Id*. at 51-52, 67-68. To support that theory, the State elicited the testimony of another assistant warden of an Illinois correctional center who did not witness the altercation but testified about it based on a report, which was entered into evidence. *Id*. at 68. In contrast, the experts in this case did not rely on a single incident: there were dozens. Some incidents involved sexual misconduct, and some did not. And they occurred at several different institutions over years. More importantly, the experts' testimonies do not reveal that they found details about particular incidents—which are more susceptible to the sort of trustworthiness concerns noted in *Smith*—significant. Rather, they found the general nature of Steen's conduct and its reoccurrence to be significant. Steen also admitted to much of this conduct in his interviews with the experts. Additionally, Steen's misconduct led IDJJ to move him to different facilities more than once and deny parole. We find that the record includes ample indicia that Steen's disciplinary records were reliable for the experts to consider as they did.

¶ 38    Aside from the trustworthiness of his disciplinary records, Steen argues that the records were insufficient to prove he is an SVP. He asserts the State's experts' opinions "heavily relied on" his disciplinary reports and such reports were the "primary basis" for their opinions. The record does not support this contention. Drs. Nicolai and Travis did not consider only the institutional disciplinary aspect of Steen's records. They reviewed police reports from his numerous arrests before he was in custody, evaluations conducted by other mental health professionals, and his treatment record. Further, the experts' considered information apart from Steen's disciplinary records in reaching their opinions, including their interviews with Steen, an actuarial instrument,

and aggravating and mitigating risk factors. Thus, Steen's claim that the experts heavily relied on his disciplinary records and that such records were the primary basis for their opinions distorts the record. Contrary to his assertion, the State was not "backed into a tricky evidentiary corner" of relying solely on Steen's discipline while in custody. See *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 38 (observing that the State "likely would be backed into a tricky evidentiary corner" if its experts based their diagnoses solely on an SVP respondent's discipline in DHS custody).

¶ 39 Steen further argues that the experts' consideration of Steen's disciplinary records was improper to support their opinions regarding his propensity to reoffend because none of the incidents were, in themselves, acts of sexual violence. We are not persuaded by this fact. The SVP Act does not require multiple sexually violent offenses, or subsequent acts that would amount to a sexually violent offense, for a respondent to be found an SVP. Further, Steen was held in facilities that, by design, prevent him from committing such acts. "[T]he State can satisfy its burden on an SVP petition even in the complete absence of sexually overt acts in the controlled environment of a prison." [Internal quotation marks omitted.] *Id.* Importantly, while misconduct that by itself would not constitute sexual violence was considered in this case, a resulting SVP determination is not a punishment for those acts. Rather, Steen's misconduct was relevant evidence taken within the totality of the experts' evaluations in reaching their opinions and the court's consideration in rendering its judgment based on statutory criteria. In sum, we do not find that the State's experts' inclusion of Steen's disciplinary records renders the evidence so unsatisfactory or improbable that the court could not credit their opinions.

¶ 40 Steen next argues that the evidence was insufficient to prove he is an SVP because Static-99R, used by Drs. Nicolai and Travis, was an improper tool to assess his risk of reoffending.

He notes that despite each experts' stated reservation about using Static-99R to assess a juvenile offender, Dr. Nicolai used Static-99R because she determined his aggravated sexual abuse offense was "adult in nature" and Dr. Travis concluded Static-99R was applicable since Steen exposed himself in custody as an adult. Steen contends neither expert provided an adequate explanation for their decision to use Static-99R: Dr. Nicolai failed to explain why the offense committed at age 12 was "adult in nature" and Dr. Travis relied on a nonviolent offense.

¶ 41     We disagree that Dr. Nicolai failed to explain her reasoning for determining that Steen's aggravated sexual abuse offense was "adult in nature" and, therefore, Static-99R was an appropriate assessment tool. She testified that Steen's offense included several factors that are atypical for juvenile sex offenses including victimizing a stranger, moving the victim to a different location, and using force. Nothing in the record supports that this was an improper basis to apply Static-99R. To the contrary, Dr. Kane, Steen's expert, echoed Dr. Nicolai's testimony that Static-99R may be used when a juvenile's offense is "adult in nature."

¶ 42     We also disagree that Dr. Travis's explained basis for using Static-99R was improper. Dr. Travis further supported his decision to apply Static-99R by explaining that the studied population underlying Static-99R included individuals who, like Steen, committed a sex offense as a juvenile and committed an act of sexual misconduct that did not involve physical contact with a victim while in custody as an adult. Nothing in the record contradicts that Static-99R can be applied to similarly situated individuals. Again, the fact that Steen did not commit a sexually violent act—that is, one involving physical contact with the victim—while in custody is of no import. In this argument and throughout his briefs, Steen repeatedly asserts that Static-99R does not differentiate between violent and nonviolent sexual offenses. We find that an empty, rhetorical point. Dr. Kane agreed with the statement, but her testimony failed to show any consequence that followed from

the proposition.[2] Steen neither directs us to anything in the record of this case nor any legal or scholarly authority to show how Static-99R's nondifferentiation between violent and nonviolent sexual offenses has any significance. Instead, he asserts such as though it is self-evidently meaningful to this case. It is not. Static-99R is a research-based tool developed by mental health professionals and social scientists. A respondent challenging its applicability would need similarly supported evidence to show it should not be used to assess him. We will not discredit Dr. Travis's opinion on mere semantics.

¶ 43    Additionally, as we noted, Drs. Nicolai and Travis did not base their opinions on narrow considerations but on a range of information including their interviews with Steen, his criminal history, prior mental health evaluations, factors that increase or decrease his risk of reoffending, and lack of progress with treatment. Static-99R was one part of a bigger picture, not the sole or pivotal basis of the experts' opinions.

¶ 44    Lastly, Steen asserts that the trial court "ignored" Dr. Kane's opinion that he did not suffer from a mental disorder creating a substantial probability that he would commit sexually violent crimes. Instead, he argues that the court should have credited Dr. Kane's explanations for his behavior, including the circumstances of his upbringing and his prolonged institutionalization during his late teens and early 20s. "In an SVP case, we rely 'heavily on the conclusions of experts' and defer to the factfinder on expert credibility." *Evans*, 2021 IL App (1st) 192293, ¶ 67 (quoting *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶ 70). We will not reweigh conflicting expert testimony, *Id.* (citing *Gavin*, 2019 IL App (1st) 180881, ¶ 39). But Steen's argument asks us to do just that.

---

[2]In fact, Dr. Kane testified she decided to assess Steen using Static-99R for the very same reason Dr. Travis did. And, Dr. Kane, like the State's experts, likewise scored Steen in the highest risk category. Dr. Kane's ultimate opinion differed based on other considerations.

¶ 45        Taking the testimony of all three experts in the light most favorable to the State, a rational factfinder could find beyond a reasonable doubt that it is substantially probable that Steen will commit future acts of sexual violence. As the trial court observed, Drs. Nicolai and Travis based their opinions on research-supported considerations while Dr. Kane's contrary opinion lacked similar support. Dr. Kane did not cite any data, research, or other basis to support her testimony that institutionalization accounts for Steen's exhibitionism. Rather, her explanation was conjectural.

¶ 46        As the trial court remarked, this is a difficult case. The young age at which he offended and his institutionalization since age 14 makes Steen unique among SVP respondents. We do not doubt that his institutionalization has contributed to his issues. But, recognizing such does not alter the fact that he meets the criteria of a sexually violent person.

¶ 47                              III. CONCLUSION

¶ 48        For these reasons, the judgment of the circuit court is affirmed.

¶ 49        Affirmed.